WOOLEY, CHIEF OF POLICE OF LEBANON, ET AL. *v.* MAYNARD ET UX.

No. 75–1453.   Argued November 29, 1976—Decided April 20, 1977

706

Burger, C. J., delivered the opinion of the Court, in which Brennan, Stewart, Marshall, Powell, and Stevens, JJ., joined, and in which White, J., joined, except insofar as it affirms the District Court's issuance of an injunction. White, J., filed an opinion dissenting in part, in which Blackmun and Rehnquist, JJ., joined, *post*, p. 717. Rehnquist, J., filed a dissenting opinion, in which Blackmun, J., joined, *post*, p. 719.

*Robert V. Johnson II*, Assistant Attorney General of New Hampshire, argued the cause for appellants. With him on the brief was *David H. Souter*, Attorney General.

*Richard S. Kohn* argued the cause for appellees. With him on the brief were *Jack B. Middleton, R. David DePuy, Melvin L. Wulf*, and *Joel M. Gora*.

Mr. Chief Justice Burger delivered the opinion of the Court.

The issue on appeal is whether the State of New Hampshire may constitutionally enforce criminal sanctions against

persons who cover the motto "Live Free or Die" on passenger vehicle license plates because that motto is repugnant to their moral and religious beliefs.

(1)

Since 1969 New Hampshire has required that noncommercial vehicles bear license plates embossed with the state motto, "Live Free or Die." [1]   N. H. Rev. Stat. Ann. § 263:1 (Supp. 1975).   Another New Hampshire statute makes it a misdemeanor "knowingly [to obscure] . . . the figures or letters on any number plate."   N. H. Rev. Stat. Ann. § 262:27–c (Supp. 1975).   The term "letters" in this section has been interpreted by the State's highest court to include the state motto.   *State* v. *Hoskin,* 112 N. H. 332, 295 A. 2d 454 (1972).

Appellees George Maynard and his wife Maxine are followers of the Jehovah's Witnesses faith.   The Maynards consider the New Hampshire State motto to be repugnant to their moral, religious, and political beliefs,[2] and therefore assert it objectionable to disseminate this message by displaying it on their automobiles.[3]   Pursuant to these beliefs, the

---

[1] License plates are issued without the state motto for trailers, agricultural vehicles, car dealers, antique automobiles, the Governor of New Hampshire, its Congressional Representatives, its Attorney General, Justices of the State Supreme Court, veterans, chaplains of the state legislature, sheriffs, and others.

[2] Mr. Maynard described his objection to the state motto:

"[B]y religious training and belief, I believe my 'government'—Jehovah's Kingdom—offers everlasting life.   It would be contrary to that belief to give up my life for the state, even if it meant living in bondage.   Although I obey all laws of the State not in conflict with my conscience, this slogan is directly at odds with my deeply held religious convictions.

". . . I also disagree with the motto on political grounds.   I believe that life is more precious than freedom."   Affidavit of George Maynard, App. 3.

[3] At the time this suit was commenced appellees owned two automobiles, a Toyota Corolla and a Plymouth station wagon.   Both automobiles were registered in New Hampshire where the Maynards are domiciled.

Maynards began early in 1974 to cover up the motto on their license plates.[4]

On November 27, 1974, Mr. Maynard was issued a citation for violating § 262:27–c. On December 6, 1974, he appeared *pro se* in Lebanon, N. H., District Court to answer the charge. After waiving his right to counsel, he entered a plea of not guilty and proceeded to explain his religious objections to the motto. The state trial judge expressed sympathy for Mr. Maynard's situation, but considered himself bound by the authority of *State* v. *Hoskin, supra,* to hold Maynard guilty. A $25 fine was imposed, but execution was suspended during "good behavior."

On December 28, 1974, Mr. Maynard was again charged with violating § 262:27–c. He appeared in court on January 31, 1975, and again chose to represent himself; he was found guilty, fined $50, and sentenced to six months in the Grafton County House of Corrections. The court suspended this jail sentence but ordered Mr. Maynard to also pay the $25 fine for the first offense. Maynard informed the court that, as a matter of conscience, he refused to pay the two fines. The court thereupon sentenced him to jail for a period of 15 days. He has served the full sentence.

Prior to trial on the second offense Mr. Maynard was charged with yet a third violation of § 262:27–c on January 3, 1975. He appeared on this complaint on the same day as for the second offense, and was, again, found guilty. This conviction was "continued for sentence" so that Maynard received no punishment in addition to the 15 days.

---

[4] In May or June 1974 Mr. Maynard actually snipped the words "or Die" off the license plates, and then covered the resulting hole, as well as the words "Live Free," with tape. This was done, according to Mr. Maynard, because neighborhood children kept removing the tape. The Maynards have since been issued new license plates, and have disavowed any intention of physically mutilating them.

## (2)

On March 4, 1975, appellees brought the present action pursuant to 42 U. S. C. § 1983 in the United States District Court for the District of New Hampshire. They sought injunctive and declaratory relief against enforcement of N. H. Rev. Stat. Ann. §§ 262:27–c, 263:1, insofar as these required displaying the state motto on their vehicle license plates, and made it a criminal offense to obscure the motto.[5] On March 11, 1975, the single District Judge issued a temporary restraining order against further arrests and prosecutions of the Maynards. Because the appellees sought an injunction against a state statute on grounds of its unconstitutionality, a three-judge District Court was convened pursuant to 28 U. S. C. § 2281. Following a hearing on the merits,[6] the District Court entered an order enjoining the State "from arresting and prosecuting [the Maynards] at any time in the future for covering over that portion of their license plates that contains the motto 'Live Free or Die.' "[7] 406 F. Supp. 1381 (1976). We noted probable jurisdiction of the appeal. 426 U. S. 946 (1976).

## (3)

Appellants argue that the District Court was precluded from exercising jurisdiction in this case by the principles of

[5] Appellees sought (a) injunctions against future criminal prosecutions for violation of the statutes and (b) an injunction requiring that in future years they be issued license plates that do not bear the state motto.

[6] Several months elapsed between the issuance of the temporary restraining order and the hearing on the merits. This delay was occasioned by the request of the State pending consideration of a bill in the New Hampshire Legislature that would have made inclusion of the state motto on passenger vehicle license plates optional with the car owner. The bill failed to gain enactment.

[7] The District Court refused to order the State of New Hampshire to issue the Maynards license plates without the state motto, although it noted that there was evidence on the record that New Hampshire could easily do so. 406 F. Supp., at 1389. See n. 1, *supra*.

equitable restraint enunciated in *Younger* v. *Harris,* 401 U. S. 37 (1971). In *Younger* the Court recognized that principles of judicial economy, as well as proper state-federal relations, preclude federal courts from exercising equitable jurisdiction to enjoin ongoing state prosecutions. *Id.,* at 43. However, when a genuine threat of prosecution exists, a litigant is entitled to resort to a federal forum to seek redress for an alleged deprivation of federal rights. See *Steffel* v. *Thompson,* 415 U. S. 452 (1974); *Doran* v. *Salem Inn, Inc.,* 422 U. S. 922, 930–931 (1975). *Younger* principles aside, a litigant is entitled to resort to a federal forum in seeking redress under 42 U. S. C. § 1983 for an alleged deprivation of federal rights. *Huffman* v. *Pursue, Ltd.,* 420 U. S. 592, 609–610, n. 21 (1975). Mr. Maynard now finds himself placed "between the Scylla of intentionally flouting state law and the Charybdis of forgoing what he believes to be constitutionally protected activity in order to avoid becoming enmeshed in [another] criminal proceeding." *Steffel* v. *Thompson, supra,* at 462. Mrs. Maynard, as joint owner of the family automobiles, is no less likely than her husband to be subjected to state prosecution. Under these circumstances he cannot be denied consideration of a federal remedy.

Appellants, however, point out that Maynard failed to seek review of his criminal convictions and cite *Huffman* v. *Pursue, Ltd., supra,* for the propositions that "a necessary concomitant of *Younger* is that a party in appellee's posture must exhaust his state appellate remedies before seeking relief in the District Court," 420 U. S., at 608, and that *"Younger* standards must be met to justify federal intervention in a state judicial proceeding as to which a losing litigant has not exhausted his state appellate remedies," *id.,* at 609. *Huffman,* however, is inapposite. There the appellee was seeking to prevent, by means of federal intervention, enforcement of a state-court

judgment declaring its theater a nuisance. We held that appellee's failure to exhaust its state appeals barred federal intervention under the principles of *Younger:* "Federal posttrial intervention, in a fashion designed to annul the results of a state trial . . . deprives the States of a function which quite legitimately is left to them, that of overseeing trial court dispositions of constitutional issues which arise in civil litigation over which they have jurisdiction." *Ibid.*

Here, however, the suit is in no way "designed to annul the results of a state trial" since the relief sought is wholly prospective, to preclude further prosecution under a statute alleged to violate appellees' constitutional rights. Maynard has already sustained convictions and has served a sentence of imprisonment for his prior offenses.[8] He does not seek to have his record expunged, or to annul any collateral effects those convictions may have, *e. g.,* upon his driving privileges. The Maynards seek only to be free from prosecutions for future violations of the same statutes. *Younger* does not bar federal jurisdiction.

In their complaint, the Maynards sought both declaratory and injunctive relief against the enforcement of the New Hampshire statutes. We have recognized that although " '[o]rdinarily . . . the practical effect of [injunctive and declaratory] relief will be virtually identical,' " *Doran* v. *Salem Inn, supra,* at 931, quoting *Samuels* v. *Mackell,* 401 U. S. 66, 73 (1971), a "district court can generally protect the interests of a federal plaintiff by entering a declaratory judgment, and therefore the stronger injunctive medicine will be unnecessary." *Doran, supra,* at 931. It is correct that generally a

---

[8] As to the offense which was "continued for sentence," see *supra,* at 708, the District Court found that "[n]o collateral consequences will attach as a result of it unless Mr. Maynard is arrested and prosecuted for the violation of NHRSA 262:27–c at some time in the future." 406 F. Supp., at 1384.

court will not enjoin "the enforcement of a criminal statute even though unconstitutional," *Spielman Motor Co.* v. *Dodge,* 295 U. S. 89, 95 (1935), since "[s]uch a result seriously impairs the State's interest in enforcing its criminal laws, and implicates the concerns for federalism which lie at the heart of *Younger,*" *Doran, supra,* at 931. But this is not an absolute policy and in some circumstances injunctive relief may be appropriate. "To justify such interference there must be exceptional circumstances and a clear showing that an injunction is necessary in order to afford adequate protection of constitutional rights." *Spielman Motor Co., supra,* at 95.

We have such a situation here for, as we have noted, three successive prosecutions were undertaken against Mr. Maynard in the span of five weeks. This is quite different from a claim for federal equitable relief when a prosecution is threatened for the first time. The threat of repeated prosecutions in the future against both him and his wife, and the effect of such a continuing threat on their ability to perform the ordinary tasks of daily life which require an automobile, is sufficient to justify injunctive relief. Cf. *Douglas* v. *City of Jeannette,* 319 U. S. 157 (1943). We are therefore unwilling to say that the District Court was limited to granting declaratory relief. Having determined that the District Court was not required to stay its hand as to either appellee,[9] we turn to the merits of the Maynards' claim.

---

[9] If the totality of appellants' arguments were accepted, a § 1983 action could never be brought to enjoin state criminal prosecutions. According to appellants, *Younger* principles bar Mr. Maynard from seeking an injunction because he has already been subjected to prosecution. As to Mrs. Maynard, they argue, in effect, that the action is premature because no such prosecution has been instituted. Since the two spouses were similarly situated but for the fact that one has been prosecuted and one has not, we fail to see where appellants' argument would ever leave room for federal intervention under § 1983.

## (4)

The District Court held that by covering up the state motto "Live Free or Die" on his automobile license plate, Mr. Maynard was engaging in symbolic speech and that "New Hampshire's interest in the enforcement of its defacement statute is not sufficient to justify the restriction on [appellee's] constitutionally protected expression." 406 F. Supp., at 1389. We find it unnecessary to pass on the "symbolic speech" issue, since we find more appropriate First Amendment grounds to affirm the judgment of the District Court.[10] We turn instead to what in our view is the essence of appellees' objection to the requirement that they display the motto "Live Free or Die" on their automobile license plates. This is succinctly summarized in the statement made by Mr. Maynard in his affidavit filed with the District Court:

> "I refuse to be coerced by the State into advertising a slogan which I find morally, ethically, religiously and politically abhorrent." App. 5.

We are thus faced with the question of whether the State may constitutionally require an individual to participate in the dissemination of an ideological message by displaying it on his private property in a manner and for the express purpose that it be observed and read by the public. We hold that the State may not do so.

---

[10] We note that appellees' claim of symbolic expression is substantially undermined by their prayer in the District Court for issuance of special license plates not bearing the state motto. See n. 5, *supra*. This is hardly consistent with the stated intent to communicate affirmative opposition to the motto. Whether or not we view appellees' present practice of covering the motto with tape as sufficiently communicative to sustain a claim of symbolic expression, display of the "expurgated" plates requested by appellees would surely not satisfy that standard. See n. 1, *supra; Spence* v. *Washington*, 418 U. S. 405, 410–411 (1974), *United States* v. *O'Brien*, 391 U. S. 367, 376 (1968). (MR. JUSTICE BRENNAN does not join in this note.)

## A

We begin with the proposition that the right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all. See *Board of Education* v. *Barnette,* 319 U. S. 624, 633–634 (1943); *id.,* at 645 (Murphy, J., concurring). A system which secures the right to proselytize religious, political, and ideological causes must also guarantee the concomitant right to decline to foster such concepts. The right to speak and the right to refrain from speaking are complementary components of the broader concept of "individual freedom of mind." *Id.,* at 637. This is illustrated by the recent case of *Miami Herald Publishing Co.* v. *Tornillo,* 418 U. S. 241 (1974), where we held unconstitutional a Florida statute placing an affirmative duty' upon newspapers to publish the replies of political candidates whom they had criticized. We concluded that such a requirement deprived a newspaper of the fundamental right to decide what to print or omit:

> "Faced with the penalties that would accrue to any newspaper that published news or commentary arguably within the reach of the right-of-access statute, editors might well conclude that the safe course is to avoid controversy. Therefore, under the operation of the Florida statute, political and electoral coverage would be blunted or reduced. Government-enforced right of access inescapably 'dampens the vigor and limits the variety of public debate,' *New York Times Co.* v. *Sullivan,* 376 U. S. [254,] 279 [(1964)]." *Id.,* at 257 (footnote omitted).

The Court in *Barnette, supra,* was faced with a state statute which required public school students to participate in daily public ceremonies by honoring the flag both with words and traditional salute gestures. In overruling its prior decision in *Minersville District* v. *Gobitis,* 310 U. S. 586 (1940), the Court held that "a ceremony so touching matters of opinion and political attitude may [not] be imposed upon

the individual by official authority under powers committed to any political organization under our Constitution." 319 U. S., at 636. Compelling the affirmative act of a flag salute involved a more serious infringement upon personal liberties than the passive act of carrying the state motto on a license plate, but the difference is essentially one of degree. Here, as in *Barnette*, we are faced with a state measure which forces an individual, as part of his daily life—indeed constantly while his automobile is in public view—to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable. In doing so, the State "invades the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control." *Id.,* at 642.

New Hampshire's statute in effect requires that appellees use their private property as a "mobile billboard" for the State's ideological message—or suffer a penalty, as Maynard already has. As a condition to driving an automobile—a virtual necessity for most Americans—the Maynards must display "Live Free or Die" to hundreds of people each day.[11] The fact that most individuals agree with the thrust of New Hampshire's motto is not the test; most Americans also find the flag salute acceptable. The First Amendment protects the right of individuals to hold a point of view different from the majority and to refuse to foster, in the way New Hampshire commands, an idea they find morally objectionable.

## B

Identifying the Maynards' interests as implicating First Amendment protections does not end our inquiry however.

---

[11] Some States require that certain documents bear the seal of the State or some other official stamp for purposes of recordation. Such seal might contain, albeit obscurely, a symbol or motto having political or philosophical implications. The purpose of such seal, however, is not to advertise the message it bears but simply to authenticate the document by showing the authority of its origin.

We must also determine whether the State's countervailing interest is sufficiently compelling to justify requiring appellees to display the state motto on their license plates. See, *e. g.*, *United States* v. *O'Brien*, 391 U. S. 367, 376–377 (1968). The two interests advanced by the State are that display of the motto (1) facilitates the identification of passenger vehicles,[12] and (2) promotes appreciation of history, individualism, and state pride.

The State first points out that passenger vehicles, but not commercial, trailer, or other vehicles are required to display the state motto. Thus, the argument proceeds, officers of the law are more easily able to determine whether passenger vehicles are carrying the proper plates. However, the record here reveals that New Hampshire passenger license plates normally consist of a specific configuration of letters and numbers, which makes them readily distinguishable from other types of plates, even without reference to the state motto.[13] Even were we to credit the State's reasons and "even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgment must be viewed in the light of less drastic means for achieving the

---

[12] The Chief of Police of Lebanon, N. H., testified that "enforcement of the motor vehicle laws is facilitated by the State Motto appearing on non-commercial license plates, the benefits being the ease of distinguishing New Hampshire license plates from those of similar colors of other states and the ease of discovering misuse of license plates, for instance, the use of a 'trailer' license plate on a non-commercial vehicle." Brief for Appellants 20.

[13] New Hampshire passenger vehicle license plates generally consist of two letters followed by four numbers. No other license plate category displays this combination, and no other category bears the state motto. See n. 1, *supra*. However, of the approximately 325,000 passenger plates in New Hampshire, 9,999 do not follow the regular pattern, displaying numbers only, preceded by no letters. App. 50–53.

same basic purpose." *Shelton* v. *Tucker,* 364 U. S. 479, 488 (1960) (footnotes omitted).

The State's second claimed interest is not ideologically neutral. The State is seeking to communicate to others an official view as to proper appreciation of history, state pride, and individualism. Of course, the State may legitimately pursue such interests in any number of ways. However, where the State's interest is to disseminate an ideology, no matter how acceptable to some, such interest cannot outweigh an individual's First Amendment right to avoid becoming the courier for such message.[14]

We conclude that the State of New Hampshire may not require appellees to display the state motto[15] upon their vehicle license plates; and, accordingly, we affirm the judgment of the District Court.

*Affirmed.*

MR. JUSTICE WHITE, with whom MR. JUSTICE BLACKMUN and MR. JUSTICE REHNQUIST join in part, dissenting in part.

*Steffel* v. *Thompson,* 415 U. S. 452 (1974), held that when state proceedings are not pending, but only threatened, a declaratory judgment may be entered with respect to the state statute at issue without regard to the strictures of *Younger* v. *Harris,* 401 U. S. 37 (1971). But *Steffel* left

---

[14] Appellants do not explain why advocacy of these values is enhanced by display on private citizens' cars but not on the cars of officials such as the Governor, Supreme Court Justices, Members of Congress, and sheriffs. See n. 1, *supra.*

[15] It has been suggested that today's holding will be read as sanctioning the obliteration of the national motto, "In God We Trust" from United States coins and currency. That question is not before us today but we note that currency, which is passed from hand to hand, differs in significant respects from an automobile, which is readily associated with its operator. Currency is generally carried in a purse or pocket and need not be displayed to the public. The bearer of currency is thus not required to publicly advertise the national motto.

open whether an injunction should also issue in such circumstances. 415 U. S., at 463. Then *Doran* v. *Salem Inn, Inc.,* 422 U. S. 922 (1975), approved issuance by a federal court of a preliminary injunction against a threatened state prosecution, but only pending decision on the declaratory judgment and only then subject to "stringent" standards which should cause a district court to "weigh carefully the interests on both sides," since prohibiting the enforcement of the State's criminal law against the federal plaintiff, even pending final resolution of his case, "seriously impairs the State's interest in enforcing its criminal laws, and implicates the concerns for federalism which lie at the heart of *Younger.*" *Id.,* at 931. Although finding the issuance of a preliminary injunction not an abuse of discretion in that case, the Court also distinguished between a preliminary injunction *pendente lite* and a permanent injunction at the successful conclusion of the federal case; for "a district court can generally protect the interests of a federal plaintiff by entering a declaratory judgment, and therefore the stronger injunctive medicine will be unnecessary." *Ibid.*

*Doran* was thus true to the teachings of *Douglas* v. *City of Jeannette,* 319 U. S. 157 (1943), where the Court held that an injunction against threatened state criminal prosecutions should not issue even though the underlying state statute had already been invalidated, relying on the established rule "that courts of equity do not ordinarily restrain criminal prosecutions." *Id.,* at 163. A threatened prosecution "even though alleged to be in violation of constitutional guaranties, is not a ground for equity relief . . . ." *Ibid.* An injunction should issue only upon a showing that the danger of irreparable injury is both "great and immediate," citing the same authorities to this effect that this Court relied on in *Younger* v. *Harris, supra.* In each of the cited cases—and they do not exhaust the authorities to the same effect—criminal prosecutions were not pending when this Court ruled that a federal

equity court should not enter the injunction. "The general rule is that equity will not interfere to prevent the enforcement of a criminal statute even though unconstitutional. . . . To justify such interference there must be exceptional circumstances and a clear showing that an injunction is necessary in order to afford adequate protection of constitutional rights." *Spielman Motor Co.* v. *Dodge*, 295 U. S. 89, 95 (1935).

The Court has plainly departed from the teaching of these cases. The whole point of *Douglas* v. *City of Jeannette*'s admonition against injunctive relief was that once a declaratory judgment had issued, further equitable relief would depend on the existence of unusual circumstances thereafter. Here the State's enforcement of its statute prior to the declaration of unconstitutionality by the federal court would appear to be no more than the performance of their duty by the State's law enforcement officers. If doing this much prior to the declaration of unconstitutionality amounts to unusual circumstances sufficient to warrant an injunction, the standard is obviously seriously eroded.

Under our cases, therefore, more is required to be shown than the Court's opinion reveals to affirm the issuance of the injunction. To that extent I dissent.

MR. JUSTICE REHNQUIST, with whom MR. JUSTICE BLACKMUN joins, dissenting.

The Court holds that a State is barred by the Federal Constitution from requiring that the state motto be displayed on a state license plate. The path that the Court travels to reach this result demonstrates the difficulty in supporting it. The Court holds that the required display of the motto is an unconstitutional "required affirmation of belief." The District Court, however, expressly refused to consider this contention, and noted that, in an analogous case, a decision of the Supreme Court of New Hampshire had reached precisely the opposite result. See *State* v. *Hoskin*, 112 N. H. 332, 295

A. 2d 454 (1972). The District Court found for appellees on the ground that the obscuring of the motto was protected "symbolic speech." This Court, in relying upon a ground expressly avoided by the District Court, appears to disagree with the ground adopted by the District Court; indeed it points out that appellees' claim of symbolic expression has been "substantially undermined" by their very complaint in this action. *Ante,* at 713 n. 10.

I not only agree with the Court's implicit recognition that there is no protected "symbolic speech" in this case, but I think that that conclusion goes far to undermine the Court's ultimate holding that there is an element of protected expression here. The State has not forced appellees to "say" anything; and it has not forced them to communicate ideas with nonverbal actions reasonably likened to "speech," such as wearing a lapel button promoting a political candidate or waving a flag as a symbolic gesture. The State has simply required that *all** noncommercial automobiles bear license tags with the state motto, "Live Free or Die." Appellees have not been forced to affirm or reject that motto; they are simply required by the State, under its police power, to carry a state auto license tag for identification and registration purposes.

In Part 4-A, the Court relies almost solely on *Board of Education* v. *Barnette,* 319 U. S. 624 (1943). The Court cites *Barnette* for the proposition that there is a constitutional right, in some cases, to "refrain from speaking." *Ante,* at 714. What the Court does not demonstrate is that there is any "speech" or "speaking" in the context of this case. The Court also relies upon the "right to decline to foster [religious, political, and ideological] concepts," *ibid.,* and treats the state law in this case as if it were forcing appellees to proselytize, or to advocate an ideological point of view. But this begs the question. The issue, unconfronted by the Court, is

---

*See *ante,* at 707 n. 1 for *de minimis* exceptions.

whether appellees, in displaying, as they are required to do, state license tags, the format of which is known to all as having been prescribed by the State, would be considered to be advocating political or ideological views.

The Court recognizes, as it must, that this case substantially differs from *Barnette,* in which schoolchildren were forced to recite the pledge of allegiance while giving the flag salute. *Ante,* at 714–715. However, the Court states "the difference is essentially one of degree." *Ante,* at 715. But having recognized the rather obvious differences between these two cases, the Court does not explain why the same result should obtain. The Court suggests that the test is whether the individual is forced "to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable." *Ibid.* But, once again, these are merely conclusory words, barren of analysis. For example, were New Hampshire to erect a multitude of billboards, each proclaiming "Live Free or Die," and tax all citizens for the cost of erection and maintenance, clearly the message would be "fostered" by the individual citizen-taxpayers and just as clearly those individuals would be "instruments" in that communication. Certainly, however, that case would not fall within the ambit of *Barnette.* In that case, as in this case, there is no *affirmation* of belief. For First Amendment principles to be implicated, the State must place the citizen in the position of either apparently or actually "asserting as true" the message. This was the focus of *Barnette,* and clearly distinguishes this case from that one.

In holding that the New Hampshire statute does not run afoul of our holding in *Barnette,* the New Hampshire Supreme Court in *Hoskin, supra,* at 336, 295 A. 2d, at 457, aptly articulated why there is no required affirmation of belief in this case:

"The defendants' membership in a class of persons required to display plates bearing the State motto carries

no implication and is subject to no requirement that they endorse that motto or profess to adopt it as matter of belief."

As found by the New Hampshire Supreme Court in *Hoskin*, there is nothing in state law which precludes appellees from displaying their disagreement with the state motto as long as the methods used do not obscure the license plates. Thus appellees could place on their bumper a conspicuous bumper sticker explaining in no uncertain terms that they do not profess the motto "Live Free or Die" and that they violently disagree with the connotations of that motto. Since any implication that they affirm the motto can be so easily displaced, I cannot agree that the state statutory system for motor vehicle identification and tourist promotion may be invalidated under the fiction that appellees are unconstitutionally forced to affirm, or profess belief in, the state motto.

The logic of the Court's opinion leads to startling, and I believe totally unacceptable, results. For example, the mottoes "In God We Trust" and "E Pluribus Unum" appear on the coin and currency of the United States. I cannot imagine that the statutes, see 18 U. S. C. §§ 331 and 333, proscribing defacement of United States currency impinge upon the First Amendment rights of an atheist. The fact that an atheist carries and uses United States currency does not, in any meaningful sense, convey any affirmation of belief on his part in the motto "In God We Trust." Similarly, there is no affirmation of belief involved in the display of state license tags upon the private automobiles involved here.

I would reverse the judgment of the District Court.