**NEWARK TEACHERS ASSOCIATION, Plaintiff,**

v.

**NEWARK CITY BOARD OF EDUCA-TION et al., Defendants.**

No. C–2–77–185.

United States District Court, S. D. Ohio, E. D.

Feb. 8, 1978.

Frederic A. Portman, Green, Schiavoni, Murphy & Haines, Columbus, Ohio, for plaintiff.

John C. Burkholder, Means, Bichimer, Burkholder & Baker Co., L.P.A., Columbus, Ohio, for defendants.

## OPINION AND ORDER

KINNEARY, District Judge.

This matter is before the Court on the parties' cross-motions for summary judgment. Pursuant to agreement of the parties and an order of this Court dated June 30, 1977, stipulations of fact were submitted to provide a factual basis for the Court's decision on the motions. Reply briefs opposing the respective motions are also before the Court for consideration.

The crux of the issue in this case is plaintiff's placement of tiny stickers, no more than one-half inch square, on mailboxes located in the principal's offices of schools operated by the defendant Newark City Board of Education [hereinafter "Board"]. By graphically identifying those teachers who had elected to affiliate with the association, these decals were intended to facilitate the distribution of association literature to association members. Some five weeks after association members had affixed the decals, however, the administration ordered their removal. This order was in response to objections from nonmember teachers, who felt that plaintiff's using the decals in this manner constituted a form of coercion.

Plaintiff thereupon elected to initiate the grievance procedure which had been adopted almost two years earlier and incorporated into the employment contracts between the certificated teaching personnel and the Board. The grievance proceeded through levels I and II without being satisfactorily resolved. Level III was initiated on December 6, 1976. Under the provisions of the contract, this level consists of a meeting with the superintendent followed by his written response. If the grievant is still not satisfied, he must file his level IV petition within fifteen days of his filing the level III petition. The meeting in this instance was held on December 13, the written response was tendered on December 20, and the request for level IV consideration was filed on January 5.

At level IV the grievant meets with the Board in executive session in an effort to resolve the differences. But this time the Board's clerk rejected plaintiff's request to be included in the agenda for the next Board meeting on the ground that the request was filed out of time. The association thereupon requested arbitration pursuant to level V, but this was rejected by defendant Briggs, who pointed out that since the plaintiff failed to file its level IV petition he considered the grievance resolved.

Defendants have raised the issue of the "resolved" grievance by way of an estoppel argument. The issue is not, however, as clear-cut as would appear on first impression. The contractual provision on which defendants relied in rejecting the level IV petition reads simply "[a] day shall refer to a calendar day, excluding weekends." There is no indication of the treatment to be given vacation time. Under the principle of *expressio unius, exclusio alterius*, this would imply that vacation time falling on a weekday would be included in any computation. On the other hand, there is no purpose served in excluding weekends which

does not apply equally to vacation time. In the present circumstances, the resolution of this issue is critical. Although there were no stipulations as to the length of defendants' Christmas vacation in 1976, it may be assumed for purposes of discussion that it included ten weekdays. Excluding this time from the relevant computation would mean that plaintiff's level IV petition was filed within time.

There is, moreover, a second issue lurking here. The superintendent's contractual authority unilaterally to reject a level V petition, for whatever reason, is doubtful. At level V the contract provides that upon proper notification to the superintendent "[a] grievance *shall* be submitted to an arbitrator . . . ." [emphasis supplied.] Admittedly, this mandatory language is somewhat contradicted by the use of the verb "request" at the close of level IV. But the critical determination at this point is that one may validly dispute Briggs' authority to reject arbitration out of hand.

These two questions of contract interpretation impale this Court on the horns of a dilemma which appears to be one of first impression. Plaintiff in this action is clearly alleging a constitutional deprivation by persons acting under color of state law. Such an assertion certainly states a claim under Title 42, United States Code, Section 1983. Under applicable Supreme Court authority, a plaintiff making such a claim need not exhaust any available state law remedies, *Allee v. Medrano*, 416 U.S. 802, 814, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974); *McNeese v. Board of Education*, 373 U.S. 668, 672–73, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963); *Monroe v. Pape*, 365 U.S. 167, 183, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), nor is this Court bound to observe the doctrine of equitable restraint. *See Wooley v. Maynard*, 430 U.S. 705, 710, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977); *Mitchum v. Foster*, 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972). Although none of these cases involved an arguably pending grievance procedure, the logic supporting federal judicial intervention in Section 1983 cases, cogently expressed in *Monroe v. Pape*, clearly applies:

[O]ne reason the legislation was passed was to afford a federal right in federal courts because, by reason of prejudice, passion, neglect, intolerance or otherwise, state laws might not be enforced and the claims of citizens to the enjoyment of rights, privileges, and immunities guaranteed by the Fourteenth Amendment might be denied by the state agencies.

365 U.S. at 180, 81 S.Ct. at 480. Admittedly, the arbitrator here is either selected by the parties or supplied by an impartial, nongovernmental entity. But this is too slender a reed to support the conclusion that a fortiori those constitutional rights which so concerned the *Monroe* court would magically be protected in a grievance procedure when there was no guarantee that they could be protected by the state's judicial system. Accordingly, were this the only applicable law, this Court would doubtless conclude that the arguably incomplete state of the grievance proceeding does not preclude its hearing and deciding the constitutional claim.

This Court is well aware, however, of the real nature of plaintiff's claim. "This case presents the all-too-familiar situation in which a dispute, commonplace in the private sector, becomes constitutional litigation by virtue of the fact that [a public employer (the school board) is] involved, rather than private entities, and the [plaintiff is], therefore, able to turn a problem of labor relations into a constitutional issue." *Connecticut State Federation of Teachers v. Board of Education Members*, 538 F.2d 471, 478 (2d Cir. 1976). Accordingly, this Court finds itself confronted with the issue of how much weight to accord the equally strong precedential authority requiring deference to grievance arbitration in the labor relations context. *See Buffalo Forge Co. v. United Steelworkers of America*, 428 U.S. 397, 407, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976); *Gateway Coal Co. v. United Mineworkers of America*, 414 U.S. 368, 377–79, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974); *Boys Markets, Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235, 251–52, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970); *United Steelworkers of America v. Warrior & Gulf Navigation Co.*,

363 U.S. 574, 582–83, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); 29 U.S.C. § 173(d) (1970).

Of course, this is hardly the prototypal arbitration case envisioned by the foregoing line of authority. For one thing, the right of these employees to strike as an alternative to arbitrating their grievance is restricted by state law. *See* Ohio Revised Code § 4117.02 (Page, 1973). If a no-strike obligation is indeed the quid pro quo for an undertaking to submit grievance disputes to arbitration, *Boys Markets, supra*, 398 U.S. at 248–49, 90 S.Ct. 1583, then the absence of any necessity to enter into such an obligation must necessarily diminish the public interest in enforcing the arbitration promise. Another important distinction is that the employer here is a public entity rather than a private enterprise. The Supreme Court has recently determined that this distinction carries significant implications for Congress' ability to regulate employment relations. *See National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976).

But this Court does not believe that either of these factors substantially disfavors an extension to the public sector of the congressionally mandated policy of deferring to agreed-upon arbitration for the resolution of grievances. As in the industrial sector, the parties to this grievance have no meaningful alternative to continued dealing with one another. Regardless of the outcome of any particular grievance, members of the plaintiff association must interact with defendants' administrative staff on a daily basis. Peaceful resolution of employment disputes is therefore no less important here than it is in the private sector. Indeed, one might plausibly argue that the absence of a legal right to strike actually supports judicial enforcement of an agreement to arbitrate, since it deprives employees of a means of "letting off steam" and leaves the system with a sullen, demoralized, and less effective teaching staff.

Turning to the Supreme Court's *National League of Cities* decision, this Court finds it is logically distinguishable from the issues raised in this case. Because Congress' 1974 extension of the Fair Labor Standards Act to states and their political subdivisions directly "supplant[ed] the considered policy choices of the States' elected officials and administrators as to how they wish to structure pay scales in state employment," the Supreme Court concluded that the amended statute would "impermissibly interfere with . . . integral governmental functions". *Id.* at 848, 851, 96 S.Ct. at 2473. Specific enforcement of an arbitration promise, on the other hand, simply gives effect to a policy choice concerning the procedure of dispute resolution which both parties presumably made at the time they entered the contract. It can hardly be claimed that by compelling adherence to a contractual promise, a federal court is "interfering with integral governmental functions" in a manner even remotely similar to that of a legislative authority seeking to prescribe minimum wages and maximum hours. This is particularly true where, as here, the arbitrator's ultimate decision is not binding.

In addition, important policy arguments favor specific enforcement of a public sector agreement to arbitrate. As in the private sector, the contract between these parties cannot conceivably anticipate the myriad disputes capable of arising in the educational context. It is no more seemly for a court to second-guess educators in the performance of their profession than it is for a court to seek to impose its rule upon a workplace with which it is totally unfamiliar. "The ablest judge cannot be expected to bring the same experience and competence to bear upon the determination of a grievance [as an arbitrator], because he cannot be similarly informed." *Steelworkers v. Warrior & Gulf Navigation Co., supra*, 363 U.S. at 582, 80 S.Ct. at 1353. The "common law of the shop" has its place in the public classroom as well as at the private workbench.

Of equal importance is the paucity of time and money consumed by the arbitral process. If, as feared by the Second Circuit, federal courts supplant arbitrators as an important means of resolving public sec-

tor employment disputes, it will be at the expense not only of an overtaxed judiciary but also of an underfunded public sector. Parties to these disputes should be encouraged to avail themselves of this less expensive yet more efficacious alternative.

■ Forced to choose between what in this context are directly conflicting lines of authority, this Court has determined that the following test offers the strongest protection to both the legitimate expectation of individuals to federal protection of their constitutional rights and the societal interest in the peaceful resolution of employment grievances in the public sector. As in the private sector, the initial determination of arbitrability would be left to the Court. *See United Steelworkers of America v. American Mfg. Co.*, 363 U.S. 564, 568, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960). Therefore the District Court should in the first instance ascertain whether the constitutional deprivation forming the basis of the complaint arises out of circumstances which the parties have agreed would be a proper subject for the contractual grievance mechanism. If it is, then the Court should proceed no further, but should order the parties to proceed to arbitration and retain jurisdiction pending the outcome. If it is not, then the Court should of course proceed to decide the constitutional deprivation claim. Since the first possible outcome of this test would be to deprive a litigant of his otherwise unassailable right to obtain an immediate federal adjudication of a claimed constitutional deprivation, the presumption of arbitrability set forth in *Steelworkers v. Warrior & Gulf Navigation Co., supra,* cannot be applicable. Instead, the Court must ascertain which aspect of the grievance preponderates: the claimed deprivation of a constitutional right, or the failure to abide by a bargaining agreement.

■ Applying this rule to the instant circumstances, this Court concludes that an order to arbitrate is proper. The dispute is over the extent of recognition which the Board must afford to the undisputed bargaining representative of its teaching personnel. The Board has admitted that that recognition extends at least to permitting the association to use the mailboxes for organization purposes. Does it extend further to permitting unobtrusive identification of the specific mailboxes assigned to association members? Viewed in this light, the question before this Court is quite evidently much more a labor relations question than a constitutional one. Accordingly, the decision should be made first by the arbitrator.

Of course, this order does not require the arbitrator to consider the above question if he finds either that vacation time counts in determining time periods pursuant to the dispute resolution procedure, or that the superintendent has the authority to dismiss a level V petition unilaterally. He may therefore dismiss the grievance without reaching the merits, or he may conclude that it is proper to go to the merits. In either instance, this Court will retain jurisdiction should the losing party wish to litigate the constitutional question or attack the arbitrator's conclusion. Needless to say, however, the decision of the arbitrator will be accorded great weight. *See United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

WHEREUPON, this Court determines that the parties to this litigation must arbitrate their dispute pursuant to level V of their contractual grievance procedure before the Court can reach the issue of an alleged deprivation of a constitutional right. The parties are therefore directed to proceed with arbitration with all deliberate speed. This Court will retain jurisdiction over this matter pending the arbitrator's decision and any appeal therefrom.

IT IS SO ORDERED.