Magda **MARIN PIAZZA** and Victor Jose Rivera Rivera, Plaintiffs,

v.

Hon. Awilda **APONTE ROQUE**, et al., Defendants.

Civ. No. 86–1088(JP).

United States District Court, D. Puerto Rico.

May 20, 1987.

**64**

Frank Rodríguez García, Ponce, P.R., for plaintiffs.

John Nevárez, Dept. of Justice, San Juan, P.R., for defendants.

## OPINION AND ORDER

PIERAS, District Judge.

This is an action for injunctive relief and damages brought under the Civil Rights Act of 1871, 42 U.S.C. § 1983, where plaintiffs alleged violation of their constitutional rights to freedom of belief and association and to due process under the law. This Court has subject matter jurisdiction of the complaint under 28 U.S.C. section 1331 and 1343(3) and (4). The case was tried to a jury on April 6–9, 1987. On a special verdict form, the jury returned a verdict for plaintiffs, finding that their discharges were politically motivated, and that their procedural due process rights were violated. The jury awarded identical damages to each plaintiff as follows: $10,900.00 in back pay, $5,000.00 in compensatory damages, and $15,000.00 in punitive damages, to be paid by all defendants. This matter is now before the Court on the defense of qualified immunity, request for injunctive relief, and damages under the Puerto Rico Personnel Law.

Essentially, plaintiffs claim that 1) their contracts with the Department of Education as Teacher's Assistants were not renewed because of their political affiliation, and 2) their discharge was done without prior notice or hearing in violation of their rights to procedural due process. Defendants claim qualified immunity from damages on the theory that they did not violate clearly established law.

Based on the evidence submitted by the parties and after due deliberation, this

Court now makes the following Findings of Fact and Conclusions of Law.

## I. FINDINGS OF FACT

1. Plaintiffs Magda L. Marín Piazza and Víctor José Rivera Rivera were employed by the Department of Education (DOE) of the Commonwealth of Puerto Rico as Special Education Teacher's Aides, in the Adjuntas School District in the Ponce Region, at the Washington Irving School for the academic years 1983–84 and 1984–85. They were first employed under a fixed term contract that began on August 1, 1983, and extended until June 28, 1984. The DOE automatically renewed their contracts without the requirement of applications for the 1984–85 school year.

2. The plaintiffs' duties as Teacher's Aide are described as follows:

a) Collaborate with the regular teacher in the administration, correction and processing of diagnostic tests, proficiency tests (standard and of criteria) and any other instrument of mensuration.

b) Collaborate with the regular teacher in the preparation of the lesson plans based on the diagnostic carried out and the individual differences.

c) Assist groups of students that have been assigned tasks while the regular teacher attends other groups.

d) Help the regular teacher in the preparation of educational materials and in the operation of audiovisual equipment.

e) Collaborate with the regular teacher in the maintenance of a better teaching-learning atmosphere.

f) Assist in the trainings that are carried out on the local or regional levels or during or after working hours.

g) Collaborate with the teacher to maintain up-dated records and information related with the students.

h) Coordinate the daily tasks with the regular teacher.

i) Help the teacher in the preparation of the classroom before the arrival of the children and see to it that there are enough materials to be used and in place. *Exam-*

*ple*: crayons, paints, brushes, construction paper, etc.

j) Visit the homes of the children with the teacher.

k) Help the teacher attend the children while they go to the bathroom.

l) Help the teacher in outdoor activities.

m) Share, under the supervision of the teacher, the directions of games and songs in the classroom or in the yard.

n) Help plan and organize activities that the school celebrates with parents and the community.

o) Help the teacher take the children to the school lunchroom and help during this period in the development of good table and eating habits.

p) Collaborate with the rest of the personnel that take charge of the group when the teacher is absent. Plaintiff's exhibit 3.

At the time of their dismissals, plaintiffs were earning $545.00 per month. Plaintiff Rivera's academic preparation includes a high school diploma and the successful completion of 9 university credits. His affiliation with the NPP is publicly known; he has participated in party fundraisers, provided transportation to the electorate, and is now an NPP delegate. In addition to his Teacher's Aide duties cited above, his further responsibilities included taking children to the dining room and bathroom, preparing audio-visual material, and assisting teachers in preparing the following day's tasks. Plaintiff Marin's academic preparation includes a high school diploma and the successful completion of 6 university credits. Both plaintiffs successfully completed their two years experience as Teacher's Aides. The regular teacher maintained a class of severely handicapped children, which required Mrs. Marin's assistance in controlling the classroom and in following up on assigned tasks.

3. At the time of plaintiffs' first contract with the DOE, the minimum requirements for a Teacher's Aide was a high school diploma with a grade point average of at least 2.0, and the satisfactory completion of a character requirement.

4. On July 10, 1985, the Secretary of Education, Awilda Aponte Roque, introduced to the DOE Circular Letter No. 2–85–86, regarding the recruitment of Teacher's Aides. Beginning with the academic year 1985–86, all Teacher's Aides would have to meet the following minimum requirements: (1) the completion of 60 credits from a known college or university, with a minimum grade point average of 2.0, or (2) two years satisfactory experience as a Teacher's Aide.

5. Ramón O. Pagán, Interim School Superintendent of the Adjuntas School District, on August 7, 1985, certified that both plaintiffs satisfactorily performed their services as Teacher's Aide for the academic year 1984–85.

6. By letter dated May 16, 1985, and signed by Isabel Candelaria, Director of the Teaching Personnel Division, Mrs. Marín was informed that her appointment would expire on June 28, 1985. Mr. Rivera was similarly informed.

7. Both plaintiffs filled out applications for Teacher's Aide for the Adjuntas School District as required by Circular Letter No. 2–85–86. They were interviewed on separate occasions in August of 1985. A large number of other candidates who met the new minimum requirements also submitted applications for Teacher's Aide for the Adjuntas School District.

8. Both plaintiffs are members of the New Progressive Party (NPP). The NPP lost the general elections held in Puerto Rico on November 6, 1984, and the control of the Executive Branch of the Commonwealth Government, which it held for the previous eight years.

9. All defendants are members of the Popular Democratic Party (PDP), the political party whose candidate, Rafael Hernández Colón, was elected Governor of the Commonwealth of Puerto Rico in the November 6, 1984 general elections, and who at present holds said office. Awilda Aponte Roque was appointed Secretary of the Department of Education after Governor Rafael Hernández Colón had taken office as Governor of the Commonwealth of Puerto Rico, on January 2, 1985. Agustín Lau is the Ponce Regional Director for the DOE. Osvaldo Pagán is the Interim School Superintendent for the Adjuntas School District. Ernesto Luis Santiago Figueroa is the Zone Health Supervisor for the Adjuntas School District. Nydia Ortiz is the Ponce Regional Supervisor for the DOE.

10. For the 1985–86 school year, María Segarra replaced Mrs. Marín, and Angel Maldonado replaced Mr. Rivera, who were both members of the PDP. They had no prior experience as a Teacher's Aide.

11. It was the custom of the DOE to review automatically the contracts of those Teacher's Aides whose performance was satisfactory. Tomas Morales, the former School Superintendent of Adjuntas School District, told plaintiff Marín that her contract would be renewed if her evaluations were satisfactory. Mr. Morales made similar representations to plaintiff Rivera at the time of his original employment.

12. During the 1984–85 school year, there were as many as 15 Teacher's Aides in the Adjuntas School District. 11 of those were members of the NPP, and 4 were members of the PDP. Of the 11 Teacher's Aides who were members of the NPP, 1 contract was renewed, and 10 contracts were not renewed. All 4 contracts of the Teacher's Aides who were members of the PDP had their contracts renewed.

13. Circular Letter No. 2–85–86 established a Selection Committee to evaluate the applications in light of the new minimum requirements. It is composed of the School Superintendent, who chairs the Committee, the Principal of the School where there is a vacancy, and a representative from the Director of the Educational Region to which the district belongs.

## II. CONCLUSIONS OF LAW

### 1. *Procedural Due Process*

■ Public employees who have a property interest in continued employment have the right to notice and hearing before being discharged. *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985). The issue here is whether these plaintiffs indeed had

a property right to continued employment as Teacher's Aides. Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Loudermill,* 105 S.Ct. at 1491. Property rights to government employment may be created "not only by explicit contractual provisions, but also by an implied contract or officially sanctioned rules of the work place," *Cheveras Pacheco v. Rivera González,* 809 F.2d 125, 127 (1st Cir.1987), *citing Perry v. Sindermann,* 408 U.S. 593, 601–02, 92 S.Ct. 2694, 2699–2700, 33 L.Ed.2d 570 (1972), which include rules and regulations of the Department of Education.

With respect to plaintiffs' procedural due process claim, defendants' position is that it was not clearly established law at the time of plaintiff's job terminations that an employee with a contractually fixed term of employment had a property interest in continued employment. In general, defendants are correct, *Cheveras, supra,* 809 F.2d at 126, but such is not the case here.

▇▇▇ Plaintiffs were originally employed under a fixed term contract, thus granting them transitory status under the Personnel Law, 3 L.P.R.A. § 1333(12) (Supp.1985), and transitory employees may be discharged at any time during their appointment. 3 L.P.R.A. § 1336(9) (Supp. 1985). The uncontroverted facts adduced at trial reveal that these plaintiffs were not mere transitory employees. It was the custom of the Department of Education to automatically renew the contracts of Teacher's Aides receiving satisfactory evaluations. Their employer specifically told plaintiffs that they would be Teacher's Aides the following year if their work was satisfactory. Indeed, defendants initially made good on this promise, by renewing their contracts for the 1984–85 academic year without requiring further application. These representations, plus the automatic renewal, were sufficient to instill in plaintiffs an expectancy to continued employment, thus elevating plaintiffs beyond a transitory status and creating property interests. An employee may have a property interest where there are "mutually explicit understandings" between the employee and the employer that the position, notwithstanding that it may be of a contractually fixed duration, has some form of permanency. *Perry v. Sindermann,* 408 U.S. 593, 602, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972). Plaintiffs did not labor under a unilateral misunderstanding, rather, both parties shared the understanding that a mutually beneficial employment relationship would continue with plaintiffs' good work performance.

This case stands in contrast to *Cheveras Pacheco v. Rivera González,* 809 F.2d 125 (1st Cir.1987). In *Cheveras,* the First Circuit reviewed the denial of a summary judgment motion that was based on qualified immunity. The plaintiff had been a transitory employee working under successive one year contracts for nearly six years before being discharged without notice or hearing. 809 F.2d at 127. His basis for claiming a property right was his own understanding that his position was permanent in nature, without any explanation for such belief. The Court held that without more, such as "promises or representations that may give rise to a property interest," he had a mere subjective expectancy of continued employment which did not culminate into a property interest, and that defendants were entitled to qualified immunity on the claim for denial of due process. *Id.*

In the case at bar, the trial record, as opposed to the allegations contained in the summary judgment motion of *Cheveras,* reveal mutual understandings between the DOE and the plaintiffs, as well as promises and representations, that created an expectancy to further employment. We therefore hold that defendants' conduct violated plaintiffs' clearly established due process rights, and that defendants are not entitled to qualified immunity.

## 2. *First Amendment Claim*

In actions brought under 42 U.S.C. § 1983, a defense of qualified immunity from liability for damages is available to state executive officers performing discre-

tionary functions, "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). At the time of plaintiffs' demotions, the law was clearly established that public employees are protected by the First Amendment guarantees of freedom of speech and association from being discharged or demoted solely because of political affiliation, unless political affiliation is an appropriate requirement for the effective performance of the office involved.

The purpose behind defendants' conduct in this case was to demonstrate to the employees and those associated with the school system in the Adjuntas District that the power to hire, fire, manage, supervise and otherwise control employment resided in a particular political party rather than in a particular new administration. In order to accomplish such purpose, defendants had to discriminate against the plaintiffs because of their political belief and in so doing, defendants knowingly and intentionally harassed, and abused these employees in violation of their constitutional rights. This has been done by firing the plaintiffs from their jobs, and by telling the employees and the community that those not affiliated with the Popular Party are out of power and do not deserve and should not be given the respect their positions entail. The message sent to the community in general was that they must cater to the politicians of the victorious party. All this was done with political gain as the only purpose in mind. As a result of being able to control the administration through such conducts, defendants intend to put themselves on a position to make new converts to their party, thus affecting the result of the 1988 election and perpetuating themselves in power.

The government established by the founders of our nation is a government run for the benefit of all the people, not for the purpose of perpetuating the political party in power. Executive officials who insist on violating the civil rights of government employees to replace them with their "cronies" only prove that they have put their desire to stay in power and in office ahead of all other considerations in a manner reminiscent of a "president for life" syndrome. These motives and actions contravene the constitutional mandate which aims for the continuity of democracy and, above all, the preservation of freedom.

The negative effects of patronage practice on the free and efficient functioning of our government has been vigorously noted by the highest courts of the United States and Puerto Rico. *E.g., Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547; *Juan Hermán Colón v. Corporación de Renovación Urbana y Vivienda,* 84 JTS 52 (P.R.1984). The threat latent in conditioning public employment on partisan support is well expressed in *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547. First, the practice exacts a ruthless toll on the individual employee's ability to act according to his beliefs and to associate with others of like political persuasion, thus diminishing support for his political party. *Id.* at 355–6, 96 S.Ct. at 2680–1. Secondly, the free functioning of the electoral process suffers because competing political interests are not supported. The Supreme Court aptly stated the problem:

> Conditioning public employment on partisan support prevents support of competing political interests. Existing employees are deterred from such support, as well as the multitude seeking jobs. As government employment, state or federal, becomes more pervasive, the greater the dependence on it becomes, and therefore the greater becomes the power to starve political opposition by commanding partisan support, financial and otherwise. Patronage thus tips the electoral process in favor of the incumbent party, and where the practice's scope is substantial relative to the size of the electorate, the impact on the process can be significant.

*Id.* at 356, 96 S.Ct. at 2681.

■ With respect to plaintiffs' claim under the First Amendment, defendants' position is that it was not clearly established at the time of their discharge that political

affiliation was an appropriate requirement for the effective performance of the job. That claim will not detain us long, for it is elementary that political affiliation to the party in the executive branch is wholly inappropriate for a Teacher's Aide assisting in the instruction of handicapped children. Their duties are of the kind that "are measured solely by technical or professional criteria," rendering the jobs improper objects of patronage dismissal. *Mendez-Palou v. Rohena Betancourt*, 813 F.2d 1255, 1258 (1st Cir.1987). We, therefore, deny the claim for qualified immunity against this cause of action.

### 3. *Puerto Rico Civil Liability*

We entertained the claim for violations of the Personnel Law of the Commonwealth of Puerto Rico, 29 L.P.R.A. §§ 136–138 and 146, under pendent jurisdiction. *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Section 136 reads, in part:

> Any employer who dismisses, suspends, refuses to reinstate in his job, demotes, reduces the pay, or increases the working hours of, or imposes or attempts to impose heavier working conditions on, any employee or ex-employee; or in any way discriminates against him, or threatens to commit any such act, on the grounds of his affiliation with a particular political party, shall be civilly liable for a sum equal to double the amount of damages he may have caused the said employee or ex-employee through such action. . . .

■ Section 146 of the same title imposes similar double liability for discrimination in employment based on race, color, sex, social or national origin or social position, political or religious beliefs. 29 L.P.R.A. § 146 (1985). Plaintiff prayed for such relief as part of the pendent state claims to the action under 42 U.S.C. section 1983. The jury specifically found defendants had violated Puerto Rico antidiscrimination statutes by their discharging plaintiffs. Accordingly, double damages should lie.

■ The Court is not convinced, however, that the punitive damages awarded by the jury should be doubled. We decline to do so for two reasons. First, it cannot fairly be said that punitive damages are the sort of "damages [defendants] may have *caused* the said employee." 29 L.P.R.A. § 136 (emphasis supplied). Similarly, under the parallel provision of section 146, punitive damages are not "damages *sustained* by the employee . . . on account of such [discriminatory] action." 29 L.P.R.A. § 146(a)(1) (emphasis supplied). Punitive damages are assessed not as compensation for injury suffered, but for punishment of the tortfeasor. Punitive damages "are designed by the law to punish extraordinary misconduct." *Fishman v. Clancy*, 763 F.2d 485, 489 (1st Cir.1985). Because they are damages that fall outside of the definition of those that are doubled by Puerto Rico law, the Court shall not enter judgment doubling punitive damages. Second, it is clear that the legislature intended a punitive cast to these provisions. To punitively double damages already punitive would be redundant, and could lead to an outlandish award. The jury meted out what punishment is thought proper, and the Court will not disturb that considered calculation. Judgment will be entered, therefore, doubling the awarded compensatory damages alone.

### 4. *Relief*

#### a. *Injunctive:*

■ In an action brought under Section 1983, equitable relief in the form of a permanent injunction is proper. *See e.g., Wooley v. Maynard*, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977). In this action, the appropriate remedy for violations of the First and Fourteenth Amendments is reinstatement of the plaintiffs to their former positions. The plaintiffs have suffered injury by this political discrimination. The injury, however, continues as long as plaintiffs continue unemployed because of this discrimination. The public interest in the continuity of education would be served by plaintiffs' reinstatement, as the public is entitled to governmental services uninterrupted by the whimsy of political chieftans. The Court therefore finds that plaintiffs are en-

titled to reinstatement in their former positions and duties.

Finally, plaintiffs are entitled to costs and attorney's fees pursuant to the express provision of 42 U.S.C. § 1988. *Grendels' Den, Inc. v. Larkin,* 749 F.2d 945 (1st Cir.1984). Plaintiffs shall file a petition for attorney's fees within thirty (30) days.

Judgment will be entered accordingly.

IT IS SO ORDERED