Titone, J.
(concurring). I continue to believe, as I stated in Matter of Cahill v Public Serv. Commn. (69 NY2d 265, 274-280 [Titone, J., dissenting], cert denied 484 US 829), that the challenged practice at issue here, i.e., regulatory setting of utility rates, is nothing more than governmental acquiescence *115 in private economic decisionmaking not rising to the level of State action. Nonetheless, since the conclusion that State action is involved is now the "law of the case,” I am bound by that conclusion and must analyze the First Amendment issue presented accordingly. Even with that element settled, however, I find myself unable to agree with my colleagues’ approach to the complex and subtle problems presented by this ratepayer’s arguments. While I concur in their ultimate conclusion that the challenged practice, if it involves "State action,” is violative of the ratepayers’ constitutional rights, the route I have traveled to reach that conclusion differs in several important respects from that which the majority has taken. Accordingly, I write separately.
First, I find the majority’s heavy reliance on Abood v Detroit Bd. of Educ. (431 US 209) to be extremely troubling. The threshold question in Abood, which the court discussed at the outset of its opinion, was whether the government employees in that case could be compelled to pay union dues (or the equivalent in service fees) at all in light of the apparent infringement of their right not to associate with causes abhorrent to their beliefs. The court acknowledged that a significant impairment of First Amendment rights was involved, since there may be some employees who are opposed to the very concept of unions and collective bargaining. However, the impairment arising from the forced contributions to union coffers was justified by an important governmental interest in promoting and preserving labor peace. It was in this context that the Abood court went on to hold that the notion of forced contributions to the union is constitutionally valid only to the extent that the money is used for activities "germane to” collective bargaining, the union function most closely related to the identified State interest in labor peace.
The threshold constitutional problem that existed in Abood is not present in this case. In contrast to the obligatory union dues/service fees challenged in Abood, it does not violate any associational or expressional rights to compel an individual to pay for the services he has obtained from a utility company. This distinguishing feature is critical. Although reasonable minds may differ on this point, Abood may most readily be analyzed as falling within the well-established principle that even where laws impairing First Amendment rights are justified by "compelling” governmental interests, they must be narrowly tailored and may not go beyond that which is necessary to accomplish the identified governmental purpose *116 that justifies the impairment. Viewed in that light, Abood would not be controlling here, since there is no initial impairment of the ratepayers’ First Amendment rights that is analogous to the clear associational and expressional impairment involved in forcing public employees to contribute to union activities.
Furthermore, even if Abood is not be viewed as a "narrow tailoring” case, the absence of the threshold constitutional problem discussed above is significant. In Abood, because of the very nature of unions as representative agencies, the forced payment of union dues/service fees implicated the employees associational rights. Like it or not, the employees were associated with the union and the union’s activities by virtue of their involuntary contributions and of the union’s reciprocal duty to represent them. Because of this initial implied association, the further affront of requiring dissidents to pay for the union’s "nongermane” political activities — and to thereby associate themselves even further with offensive positions — was deemed violative of the employees’ First Amendment expressional and associational rights. Here, in contrast, there is, once again, no implicit association of the ratepayer with the utility company by virtue of the former’s payment of his utility bills. Therefore, the problem of compelled association that was an important consideration in Abood is not present here (see also, PruneYard Shopping Center v Robins, 447 US 74, 87).
Having concluded that Abood is not controlling, I am left to consider whether, in the absence of a rationale based directly on Abood, there is a constitutional prohibition against forcing an individual to contribute indirectly to causes with which he disagrees. On this issue, the observation that such a compulsion is " 'sinful and tyrannical’ ” (431 US, at 234-235, n 31, supra; see, majority opn, at 112) is simply too facile. Our entire system of government by majority rule is built on the notion that individual citizens may be compelled to pay for, and even serve in wars fought for, causes and ideas that offend their own personal principles (see, e.g., United States v Seeger, 380 US 163; see also, Gillette v United States, 401 US 437). As one commentator has noted, "incursions on conscience through forced 'support’ of distasteful causes is an inevitable concomitant of living in an organized society” and, accordingly, "pure peace of mind cannot be accorded high constitutional status” in a nonanarchic state (Cantor, Forced Payments to Service *117 Institutions and Constitutional Interests in Ideological Non-Association, 36 Rutgers L Rev 3, 25, 26).
While the First Amendment may, as a general matter, prohibit the State from restricting citizens’ free expression of ideas, and from compelling them to express or even associate with ideas offensive to them (see, Wooley v Maynard, 430 US 705), there can be no doubt that the government may, through general taxes or special levies, force citizens to pay for projects and causes that are abhorrent to their beliefs. Thus, the real question here is whether there is anything in the Constitution that prohibits the government from doing indirectly what it unquestionably may do directly, i.e., effect a transfer of wealth from individuals to arguably socially useful projects, by permitting private business entities to "tax” their customers as a means of financing their own charitable contributions.
As to this issue, it does not suffice to attack the Public Service Commission’s policy on the ground that it represents "governmental channelling * * * of public expression through preferred agents” or that it "would convert the free marketplace of ideas to the consumer-subsidized preserve of corporate utility ideas.” (Majority opn, at 114.) Once again, the majority’s hyperbole proves too much. The government establishes "preferred agents” — and delegates to corporations (and other private citizens) the power to spend public money on the causes of their choice — whenever it allows a tax deduction or credit for private "charitable contributions” (Regan v Taxation with Representation, 461 US 540, 544).
Hence, there can be no serious constitutional objection to a governmental policy that delegates to a private concern the power to select the causes that will receive subsidies derived, directly or indirectly, from citizens’ pockets, provided, of course, that the policy is a content-neutral one (see, id., at 548). The constitutional objection, if any, must thus be based on the other prong of the equation — the State’s delegation of its power to impose a tax, as distinguished from its power to spend the taxed funds. It is this aspect of the PSC’s policy which I find to be most troublesome.
The analogy between the typically governmental function of taxation and the utilities’ government-approved "pass-along” policy exists because the latter entails the imposition on ratepayers of a levy that is then used to support activities aimed at advancing the interests of the community at large, as distinguished from the interests of the utilities’ sharehold *118 ers and employees. In a democratic society, such a levy is permissible, if implemented directly by the government, because the government is ultimately accountable to the taxed citizens through the established political mechanisms for the expression of the majority’s will. These mechanisms are circumvented, however, when the decisions as to whether and how much to "tax” are delegated to a private corporation, which is not accountable through any of these mechanisms.
Viewed in this light, the problem presented in this case may more readily be categorized as one involving the "no taxation without representation” principle than as one involving an impairment of First Amendment associational or expressional rights. Whatever its proper characterization, however, it seems clear that, assuming the existence of State action, a problem of constitutional magnitude exists. Accordingly, I concur in the majority’s decision to affirm the order of the court below.
Before closing, I must stress that my conclusion herein does not represent any implicit skepticism about the value to the community of the charitable activities that the PSC policy was designed to promote — or about the social utility of the policy itself. The past decade has ended with a widespread recognition of the limits of government’s ability to tax its citizens to pay for necessary and important social programs. This recognition has, in turn, brought about an increased sensitivity to the pressing need for volunteerism in general and, more specifically, governmental policies that encourage businesses with large concentrations of capital to donate to social and charitable projects. While the PSC’s efforts to promote volunteerism have, unfortunately, been proven to be constitutionally problematic in this specific context and, for that reason, cannot be upheld, I would hope that the court’s holding here will not be perceived as a rejection of the charitable intentions, as well as the goals, underlying the challenged actions of both the PSC and the utility companies it regulates.
Chief Judge Wachtler and Judges Simons, Kaye and Alexander concur with Judge Bellacosa; Judge Titone concurs in a separate opinion; Judge Hancock, Jr., taking no part.
Order affirmed, with costs.