Robby **ALBARADO,** et al. **Plaintiffs**

v.

**KENTUCKY RACING COMMISSION,**
et al. **Defendants**

and

**Jerry Bailey, et al. Plaintiffs**

v.

**Kentucky Racing Commission,**
et al. **Defendants**

No. Civ.A.3:04CV–231–H.

United States District Court,
W.D. Kentucky,
At Louisville.

April 29, 2004.

Order Granting Permanent Injunction
July 22, 2004.

Christopher Nelson Lasch, Goodwin & Lasch, Louisville, KY, Lead Attorney, Attorney to be Noticed, Lawrence Mentz, Biefermann Hoenig Massamill & Ruff PC, New York City, Lead Attorney, Attorney to be Noticed, Lloyd C. Ownbey, Jr, Pasadena, CA, Lead Attorney, Attorney to be Noticed, Michael Lawrence Goodwin, Goodwin & Lasch, Louisville, KY, Lead Attorney, Attorney to be Noticed, for Robby Albarado, Plaintiff.

Christopher Nelson Lasch, Lawrence Mentz, Lloyd C. Ownbey, Jr, Michael Lawrence Goodwin, (See above for address), Lead Attorney, Attorney to be Noticed, for Brian Peck, Plaintiff.

Christopher Nelson Lasch, Lawrence Mentz, Lloyd C. Ownbey, Jr, Michael Lawrence Goodwin, (See above for address), Lead Attorney, Attorney to be Noticed, for Shane Sellers, Plaintiff.

J. Bruce Miller, Michael J. Kitchen, J. Bruce Miller Law Group, Louisville, KY, Lead Attorney, Attorney to be Noticed, William P. Emrick, Kentucky Environmental & Public, Protection Cabinet, Frankfort, KY, Lead Attorney, Attorney to be Noticed, for Kentucky Racing Commission, Defendant.

J. Bruce Miller, Michael J. Kitchen, William P. Emrick, (See above for address), Lead Attorney, Attorney to be Noticed, for Kentucky Horse Racing Authority, Defendant.

## MEMORANDUM OPINION

HEYBURN, Chief Judge.

The confluence of three issues of great interest to Kentuckians and Americans form the body of this case. Standing alone these issues are easily resolved. Together in one case they present difficult choices for a court attempting to protect the meritorious rights and prerogatives of all the parties which the Court now has a duty to resolve. The three issues are (1) the rights of any citizen to exercise his First Amendment rights without unreasonable government intrusion; (2) the right of the Commonwealth of Kentucky to exercise regulatory authority over its most visible and important industry; and (3) the precise role of federal courts in arbitrating a dispute in which the first two appear to collide. All this arises in the context of the world's most famous horse race, hardly the setting for calm considerations of some significance.

For the reasons explained below, the Court concludes that Plaintiffs are entitled to the relief they request. Out of concern for the ongoing ability of the Kentucky Horse Racing Authority to maintain its regulatory control, the Court will limit its relief for the exercise of commercial speech to those jockeys who are Plaintiffs in these cases. The relief as to the Jockeys' Guild patch shall be applicable to all jockeys.

## I.

Jockeys Robby Albarado, Brian Peck, and Shane Sellers (collectively, "Albarado Plaintiffs") and jockeys Jerry Bailey, John Velazquez, José Santos, Alex Solis, and Shane Sellers (collectively, "Bailey Plaintiffs") have filed separate actions against the Kentucky Racing Commission and the Kentucky Horse Racing Authority (collectively, "the Authority"). They claim that one of the Authority's regulations, 810 KAR 1:009, Section 14(3), which prohibits jockeys from wearing advertising and promotional logos on their racing attire, violates their First and Fourteenth Amendment rights to the United States Constitution. They seek a declaration that the applicable regulation is unconstitutional on its face and as applied. They also seek an injunction against the enforcement of the regulation during the ongoing races at Churchill Downs.[1]

Albarado Plaintiffs desire to wear a patch on their breeches that bears the name of their labor organization, the Jockeys' Guild. The patch also bears a picture of a jockey's boot, the organization's trademark, and in some cases, the picture of a wheelchair as a symbol of handicapped status. They desire to display a patch of support for the Jockeys' Guild and for the organization's efforts to improve the lives of disabled jockeys. Bailey Plaintiffs want to wear "tasteful and traditional" logos advertising corporate sponsors on their breeches and/or their turtlenecks because they have an economic interest in attracting personal corporate sponsorship. All Plaintiffs race thoroughbred horses in Kentucky and want to display the Jockeys' Guild patch or a corporate logo while they are participating in horse races during the spring meet season at Churchill Downs, which runs from April 24 through July 5, 2004.

The Kentucky legislature has passed a large body of statutes governing thoroughbred racing. *See* KRS 230.210, *et seq.* Specifically, in KRS 230.215(2), the legislature has declared:

> [t]he purpose and intent of this statute in the interest of the public health, safety, and welfare, to vest in the commission forceful control of horse racing in the Commonwealth with plenary power to promulgate administrative regulations prescribing conditions under which all legitimate horse racing and wagering thereon is conducted in the Commonwealth so as to encourage the improvement of the breeds of horses in the Commonwealth to regulate and maintain horse racing at those horse race meetings in the Commonwealth of the highest quality and free of any corrupt, incompetent, dishonest, or unprincipled horse racing practices, to regulate and maintain horse racing at race meetings in the Commonwealth so as to dissipate any cloud of association with the undesirable and maintain the appearance as well as the fact of complete honesty and integrity of horse racing in the Commonwealth.

Section 230.260 authorizes the Authority to promulgate regulations in support of those broad intents and purposes. And, to this

1. The cases were filed almost simultaneously and involve similar legal questions. In the interest of efficiency, the Court will combine its rulings on both motions.

end, it has promulgated extensive regulations concerning all aspects of the thoroughbred horse racing industry. *See* 810 KAR 1:001, *et seq.*

At issue here is one specific regulation, 810 KAR 1:009, Section 14, among many the Authority has established.

It states as follows:

Attire. (1) Upon leaving the jockey room to ride in any race, each rider shall be neat and clean in appearance and wear the traditional jockey costume with all jacket buttons and catches fastened.

(2) Each jockey shall wear:

(a) The cap and jacket racing colors registered in the name of the owner of the horse he is to ride;

(b) Stock tie;

(c) White or light breeches;

(d) Top boots;

(e) Safety helmet that meets the standards of the American Society for Testing and Materials (ASTM) F1163–00;

(f) A safety vest which shall meet the standards of the American Society for Testing and Materials (ASTM) F1937–98; and

(g) A number on his right shoulder corresponding to his mount's number as shown on the saddle cloth and daily racing program.

(3) Advertising, promotional, or cartoon symbols or wording which in the opinion of the commission are not in keeping with the traditions of the turf shall be prohibited.

(4) A safety vest shall not weigh more than two (2) pounds and shall not be included in the jockey's weight when weighing out to race.

(5) The clerk of scales and attending valet shall be held jointly responsible with a rider for his neat and clean appearance and proper attire.

After the 2003 Kentucky Derby, racing stewards assessed fines of $500 against jockeys who wore the Jockeys' Guild patch. The Kentucky Racing Commission upheld these penalties. Those jockeys have filed an appeal with the Franklin County Circuit Court, and that matter is currently pending. Some of those jockeys are plaintiffs in the present lawsuit. Other jockeys are participating in these federal actions because they are concerned about actions the Authority may take this year if the jockeys display a logo or a patch. The Authority has said that it intends to enforce the regulation this year.

Plaintiff Jerry Bailey was denied the right to wear a corporate logo during the spring meets at Keeneland in Lexington. In addition, at a public hearing on April 19, 2004, the Authority informed Albarado Plaintiffs that no jockey would be allowed to display the Jockeys' Guild patch or any other prohibited item during spring meets at Churchill Downs. After learning that the Authority intends to enforce the regulation this spring at Churchill Downs, Plaintiffs filed the present actions.

## II.

As a preliminary matter, the Authority contends that the enforcement action pending in Franklin Circuit Court compels this Court to abstain from considering the relief requested here under the principles enunciated in *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). Abstention is an integral component of the comity between federal and state judicial authority and is premised upon the notion that, in unusual circumstances where important state interests are at issue, federal courts should step aside out of deference to state administrative agencies or court proceedings.[2] The abstention doctrine represents an excep-

2. The Supreme Court in *Younger* addressed the specific instance of individuals seeking to

tion to the general duty of a federal court to adjudicate disputes properly before it. For a whole variety of reasons, this case presents circumstances under which the Court must seriously consider the necessity and value of abstention.

The Authority argues abstention is mandatory under *Younger* because this federal proceeding threatens a pending state proceeding which concerns vital state interests where Plaintiffs may adequately raise their federal constitutional claims in the state proceeding. If this were so, the Court has no choice in the matter. It must abstain. *See Gibson v. Berryhill,* 411 U.S. 564, 577, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973). The Court concludes, however, that *Younger* does not govern our case.

The primary rationale for mandatory abstention under *Younger* is to prevent federal courts from enjoining existing state court proceedings, whether they be civil or criminal, on federal constitutional grounds. Here, some of the Plaintiffs in the current state action, and some new Plaintiffs, seek to enjoin the Authority from currently enforcing its regulations so that they may exercise their First Amendment rights in the future. The legal issues involved are identical in some instances and similar in others to the pending proceeding in Franklin Circuit Court. The relief these Plaintiffs request in this federal controversy, however, is an injunction against future conduct. By contrast, the state controversy involves the resolution of a fine imposed last year or an injunction against a pending proceeding. The Authority would argue that these are "distinctions without a difference." This argument deserves the most careful consideration.

The Authority is certainly not the first to note the "fine distinctions in this area." *See Parker v. Turner,* 626 F.2d 1, 6 (6th Cir.1980). Other courts discussed this distinction in the context of a *Younger* analysis. In *Wooley v. Maynard,* the Supreme Court analyzed the difference between a federal lawsuit seeking to enjoin an existing state proceeding and one merely seeking prospective relief to prevent, in effect, a future prosecution. 430 U.S. 705, 710, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977). Under those circumstances, the Court found that *Younger* does not bar federal jurisdiction. *Id.* Subsequently, many courts have attempted to make sense of these fine distinctions.[3] One cannot say that all of these cases are seamlessly consistent.

enjoin a criminal prosecution in state court. The Supreme Court's holding in *Younger* has been extended to certain civil proceedings. *See Juidice v. Vail,* 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977).

3. Just as in *Wooley,* there is no evidence that Plaintiffs brought the federal claim to annul the concurrent state court proceedings. Plaintiffs seek wholly prospective relief, to preclude further enforcement of a regulation alleged to violate Plaintiffs' constitutional rights, not at all designed to effect the state court action. *See Marks v. Stinson,* 19 F.3d 873, 873, 884 (3d Cir.1994) (the court applied *Wooley* and refrained from *Younger* abstention because the federal plaintiffs did not seek relief that would impair the ability of the state courts to adjudicate anything currently before them; the federal suit did not directly or indirectly ask the court for any relief with respect to those state proceedings and the plaintiffs were simply pursuing parallel tracks and seeking consistent relief in the federal and state systems); *Gwynedd Props., Inc. v. Lower Gwynedd Tp.,* 970 F.2d 1195, 1201 (3d Cir.1992) (holding that where federal proceedings are parallel to but do not interfere with the state proceedings, the principles of comity underlying *Younger* abstention are nor implicated, and abstention may not be appropriate where the federal plaintiff seeks only prospective relief without seeking to annul either previous state court judgments or the effect of the judgments); *Smith v. Springer,* 859 F.2d 31, 35 (7th Cir.1988) (holding that plaintiff's claim closely resembles the § 1983 action described in *Wooley* because the federal claim did not seek to annul the results of his state conviction, expungement, or any oth-

A few years after *Wooley*, the Sixth Circuit considered similar circumstances in *Parker v. Turner.* The court noted that the plaintiff sought only prospective relief; that all past state proceedings were terminated; and that no new state proceedings were pending. Nevertheless, the Circuit concluded that a federal court should not enjoin constitutional violations within a state trial setting. *Parker,* 626 F.2d at 6–10. These claims must first be handled within the state system. The Sixth Circuit rested its conclusion not upon *Younger* but upon the broad notion that the federal courts should avoid unworkable interference with state proceedings. This is advice which this Court takes seriously.

Here, the Franklin County Circuit Court proceedings are a part of Kentucky's regulatory process and concern the appeal of fines levied last year. One cannot deny the importance of the Commonwealth's interests in regulating thoroughbred racing, perhaps its signature industry that embodies so many aspects of its culture and image. The instant action, however, seeks a prospective declaration as to one of the issues in the state proceeding and does not directly undermine either the existing regulatory proceedings or the validity of the Authority's continuing regulation of thoroughbred racing. Consequently, the Court views the current circumstances as involving two concurrent, independent actions that address similar issues. Indeed, some of Plaintiffs in our case are not parties to the state case; some of the specific issues raised here are not at issue in the state case. The Supreme Court has recognized that this could present a slightly different issue for courts contemplating abstention. Because the circumstances are slightly different, it is not one that *Younger* governs directly or that requires abstention.

While these differences mean that the Court is not required to abstain, the Court should still consider giving deference to the state regulatory apparatus. In *Colorado River Water Conservation District v. United States,* the Supreme Court described another set of circumstances in which federal courts should, in the interest of wise judicial administration, stay its own proceedings in favor of a currently pending state action that raises identical issues. 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). The exercise of discretion in these circumstances is based less on the lofty considerations of federalism and more on the down-to-earth concerns for conserving judicial resources.

Plaintiffs raise issues of their federally protected constitutional rights. To be sure, Plaintiffs could raise their federal constitutional issues in either federal or state court. Federal courts, however, have always had a particular concern and expertise for the application of First Amendment protections to state regulatory schemes. In fact, the federal issues here are more complex than the state regulatory ones. Moreover, Plaintiffs' claims

er relief related to his conviction, but sought a totally different form of monetary damages); *Ballard v. Wilson,* 856 F.2d 1568, 1570 (5th Cir.1988) (holding that although the plaintiff confined his request for relief to future prosecutions, the court cannot ignore the fact that any injunction or declaratory judgment issued by a federal court would affect the course and outcome of the pending state proceedings and would serve notice to the state courts that an adverse declaratory judgment could be expected, and that a declaratory judgment as to the constitutionality of the ordinance would actually resolve an issue central to the pending state proceedings); *Almodovar v. Reiner,* 832 F.2d 1138, 1142 (9th Cir.1987) (holding that the case was governed by *Wooley* because appellant did not seek to have her record expunged or to have a standing court order overturned but only sought to be free from prosecutions for future violations of the same statute).

are unlikely to foreclose state attention to these issues or to call into question the Authority's ability to ensure the integrity of thoroughbred racing generally. Regardless of the Court's decision in this case, it should ultimately clarify both existing regulations and a process for establishing more coherent state policies.

In these circumstances, the Court could exercise its discretion to abstain. The Court would do so, if it believed that, by deciding these issues one way or another, it would upset some delicate or intricate regulatory process. That simply is not the case. The Court would likewise abstain if the constitutional deprivations complained of were illusory or technical. As framed here and in this moment, the federal constitutional issues actually predominate. The regulatory process can be repaired and its provisions amended, if need be. Once lost in a crucial moment, the First Amendment right, even as to commercial speech, is difficult to recapture. For these reasons, the Court will address the constitutional issues that Plaintiffs raise here.

The Court is acutely aware that it cannot reasonably predict the full impact of its decision. Therefore, the Court proceeds with caution. The Court's concerns are allayed by the knowledge that it decides only the discrete federal issues before it. The decision could result in the promulgation of more comprehensive and fairer regulations that have a far more direct relationship to the Authority's real and legitimate concerns for the "traditions of the turf" in Kentucky racing.

## III.

■ The Authority raises another procedural and jurisdictional issue that is much less difficult to resolve and that concerns considerably less weighty issues. The Authority suggests that the case should be stayed or dismissed due to the absence of other parties whose presence is indispensable to the completed adjudication of these issues. Fed.R.Civ.P. 19. As best the Court can determine, the Authority believes that the horse owner, trainer, and race track representative may be necessary parties to this case. It is true that jockeys interact directly with each of these entities. With some owners and trainers, they have financial, and perhaps contractual, relationships. With the race tracks, they have a variety of legal and supervisory relationships. The Court's decision in this case could alter slightly the dynamics and dimensions of those relationships. Whatever the decision, however, those relationships will not change so much that the parties cannot easily adjust.

Most importantly, no other party has enforcement authority under the regulation that the Plaintiffs oppose. Only the Authority promulgates and enforces those regulations. The regulation at issue directly affects only the jockeys. The rights of no other party are at issue. Consequently, the Court is confident that it can fairly resolve issues raised here without the necessity of joining additional parties.

## IV.

■ To succeed on a motion for preliminary injunction, Plaintiffs must show that: (1) they have "a strong likelihood of success on the merits"; (2) they would "suffer irreparable injury" if the injunction is not issued; (3) the injunction would not cause "substantial harm to others"; and (4) "the public interest would be served by issuance of the injunction." *ACLU of Ky. v. McCreary County,* 354 F.3d 438, 445 (6th Cir.2003) (quoting *Rock and Roll Hall of Fame & Museum, Inc. v. Gentile Prods.,* 134 F.3d 749, 753 (6th Cir.1998)) (internal quotation marks omitted). Courts have consistently ruled that "[w]hen a party seeks a preliminary injunction on the basis of the potential violation of the First

Amendment, the likelihood of success on the merits often will be the determinative factor." *Connection Distrib. Co. v. Reno,* 154 F.3d 281, 288 (6th Cir.1998). Thus, if Plaintiffs can show that they have a valid First Amendment claim, then the preliminary injunction should be granted.

## V.

 The Court must first determine the type of speech at issue. Restrictions on core political speech and content-based speech restrictions receive the most rigorous scrutiny under the Constitution. *Republican Party of Minn. v. White,* 536 U.S. 765, 774, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002). The Supreme Court also accords protection for commercial speech under the First Amendment. *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.,* 425 U.S. 748, 761–62, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). The Supreme Court has characterized commercial speech as speech that does "no more than propose a commercial transaction" or speech concerning a "purely economic" interest. *Id.* at 762, 96 S.Ct. 1817. For instance, the Supreme Court has considered the following factors in determining whether speech may be characterized as commercial: (1) whether the speech concerns proposals to engage in commercial transactions; (2) whether the speech references a specific product; and (3) whether the messenger has an economic motivation. *Bolger v. Youngs Drug Prods. Corp.,* 463 U.S. 60, 66–67, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983). While any one factor might not be sufficient to characterize certain speech as commercial, the presence of all three factors could be strong support for the conclusion that the speech at issue is commercial even if the speech concerns issues that are part of public debate. *Id.* at 66–68, 103 S.Ct. 2875.

Here, no one disputes that the advertising logos of the Bailey Plaintiffs constitute commercial speech. Albarado Plaintiffs argue, however, that their Jockeys' Guild patch is protected private speech. This Court now agrees. Albarado Plaintiffs testified that the Jockeys' Guild patch will raise awareness of the Jockeys' Guild and its efforts to improve working conditions of all jockeys and, more particularly, to improve the lives of disabled jockeys. True, the Jockeys' Guild provides economic and employment benefits to its members. By wearing the patch, however, Albarado Plaintiffs do not convey a message that is borne out of an economic motivation or used for a primarily advertising purpose. Any such impact would be purely incidental. The Authority did not challenge the testimony that established the purely eleemosynary and private purposes behind displaying the Jockeys' Guild patch. The Court believes that testimony and must therefore conclude that the Albarado Plaintiffs' speech is not commercial in character.

## VI.

Next, the Court must resolve which legal tests determine the constitutionality of the regulation at issue. The parties do not disagree significantly as to the legal standard, only as to its application.

 Protected speech is subject to the highest scrutiny for which the state "must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Widmar v. Vincent,* 454 U.S. 263, 270, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981). The Supreme Court, however, has recognized that protected speech may be regulated under reasonable time, place, and manner restrictions provided the regulations are content-neutral. *Consol. Edison Co., Inc. v. Pub. Serv. Comm'n,* 447 U.S. 530, 535–36, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980). In order to determine whether content-neutral regulations are

constitutional speech restrictions, courts apply the following factors: (1) the state must have a substantial or important interest; (2) the regulation must further the state's interest; (3) the regulation is no more restrictive than necessary to achieve the state's goals; and (4) the regulation leaves open sufficient alternative channels of communication. *Clark v. Cmty. for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984); *Members of the City Council v. Taxpayers for Vincent,* 466 U.S. 789, 805, 812, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984); *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). Here, the Jockeys' Guild patch that Albarado Plaintiffs want to wear is protected speech. The regulation at issue, however, is content-neutral. Thus, the Court will apply the above test in determining whether the regulation is constitutional as applied to the Jockeys' Guild patch.

By contrast, commercial speech enjoys more limited protection and is reviewed under so-called intermediate scrutiny. *Fla. Bar v. Went for It, Inc.,* 515 U.S. 618, 623, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995); *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n,* 447 U.S. 557, 563–66, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). The Supreme Court's seminal decision in *Central Hudson* establishes the appropriate legal test for determining whether a state's restrictions on commercial speech are unconstitutional.[4] Under *Central Hudson,* this Court must consider the following four factors: (1) the commercial speech must concern lawful activity and not be misleading; (2) the government must assert a substantial interest in the regulation of speech; (3) the regulation at issue must directly advance the government's interest; and (4) the regulation must be no more extensive than necessary to serve that interest. *Id.* at 566, 100 S.Ct. 2343. The Supreme Court has recognized that the *Central Hudson* test is "substantially similar" to the intermediate scrutiny test for time, place, and manner restrictions applied to content neutral regulation of pure speech. *See Lorillard Tobacco Co. v. Reilly,* 533 U.S. 525, 554, 121 S.Ct. 2404, 150 L.Ed.2d 532 (2001); *Bd. of Trs. v. Fox,* 492 U.S. 469, 477, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989). Nevertheless, *Central Hudson* remains applicable to commercial speech cases.

The state bears the burden of showing that its interests justify the speech restriction at issue. *Edenfield v. Fane,* 507 U.S. 761, 770, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993). A court may not uphold a regulation that "provides only ineffective or remote support for the government's purpose." *Cent. Hudson,* 447 U.S. at 564, 100 S.Ct. 2343. Here, the advertising logos that Bailey Plaintiffs want to display are commercial speech; therefore, the Court will apply the factors under the *Central Hudson* test to determine whether the regulation is constitutional as applied to the desired corporate sponsor logos.

The factors under the tests for content-neutral regulations and commercial speech apply very similar factors and are virtually the same in application. Both of these tests are essentially tests of intermediate scrutiny. Since the tests involve very sim-

4. The Supreme Court has acknowledged that members of the Court have disagreed with the balancing test under *Central Hudson* and advocated a more stringent test for commercial speech. The Supreme Court, however, has reaffirmed the *Central Hudson* test in more recent decisions. *See, e.g., Thompson v. W. States Med. Ctr.,* 535 U.S. 357, 367–68, 122 S.Ct. 1497, 152 L.Ed.2d 563 (2002); *Lorillard Tobacco Co. v. Reilly,* 533 U.S. 525, 554–55, 121 S.Ct. 2404, 150 L.Ed.2d 532 (2001); *Greater New Orleans Broad Ass'n, Inc. v. United States,* 527 U.S. 173, 184, 119 S.Ct. 1923, 144 L.Ed.2d 161 (1999).

ilar elements, the Court will analyze the factors under each test concurrently.[5]

## VII.

Under intermediate review, the state must establish that the applicable regulation furthers a "substantial" or "important" state interest and that the regulation is no more restrictive than necessary to accomplish the state's objective. On its preface, this particular regulation discusses the attire of jockeys and the requirement that any commercial or written adornment be "in keeping with the traditions of the turf." Thus, the regulation appears to concern ensuring that a jockey's attire is not crowded with "advertising, promotional, or cartoon symbols or wording" that would detract from the jockey's appearance and give the racing attire a commercialized appearance that often is associated with other sports. "Traditions of the turf" could therefore be assumed to mean those "traditions" that preserve a genteel, pristine appearance and atmosphere at the racetracks and that do not lend themselves to overcommercialization. No one disputes the Authority's substantial interest in regulating the sport of horseracing according to the traditions of the turf. By offering evidence explaining the "traditions of the turf," then, presumably, the Authority might establish a nexus between the state interest in preserving those "traditions" and a regulation that limits speech to that in keeping with the "traditions." The Authority, however, offered no such evidence.[6]

The Court must instead rely on the interest that the Authority did assert: protecting the integrity of horse racing by (1) ensuring that racing stewards have an unobstructed view of actions where jockey misconduct is alleged, and (2) fostering confidence in the betting public by precluding collusion among jockeys sponsored by the same advertiser. These are certainly laudable objectives. No one questions the Authority's ability and prerogative to regulate the thoroughbred racing for these and other purposes. This could surely include regulation of jockey attire. Horseracing is a complex, dangerous, lucrative, and prestigious sport in Kentucky. A certain amount of regulation is necessary to ensure the safety of the horses and the jockeys, the fairness of the competition, and a pleasant, inviting atmosphere that will encourage spectators to return to the races. To intrude on one's First Amendment rights, however, requires more justification than simply establishing a substantial state interest. Logically enough, the regulation that limits speech must itself bear some direct and material relationship to that interest.

The problem here is that neither of the interests the Authority advances bears much relationship at all to the regulation

5. Here, there is no dispute that the advertising logos espoused by Bailey Plaintiffs meet the first element under the *Central Hudson* test. The logos clearly concern lawful activity—display of corporate sponsorship—and there is no claim that the logos are false or misleading. The logos therefore constitute commercial speech protected under the First Amendment.

6. Furthermore, the meaning of "traditions of the turf" is nowhere provided in the "Definitions" section of the chapter in the regulations dedicated to thoroughbred racing. In fact, the phrase "traditions of the turf" appears only two other times: in the regulations for thoroughbred racing and quarter horse, appaloosa, and Arabian racing that concern the racing colors an owner may select. "Traditions of the turf" is likewise not de fined in the quarter horse, appaloosa, and Arabian racing regulations. For that reason, Plaintiffs contended that the term was vague and overbroad as applied. The Court suspects that an adequate definition might be supplied. The issue appears moot for the time being, as the Authority offered no evidence as to its meaning in this context.

at issue. The Court examines "the relationship between the harm that underlies the State's interest and the means identified by the State to advance that interest." *Lorillard Tobacco Co.*, 533 U.S. at 555, 121 S.Ct. 2404. The Authority says that advertising may create an obstructed view of the jockeys' attire that would prevent racing stewards from making accurate inquiry decisions. It also argues that corporate sponsorship of jockeys could encourage collusion such that betters will not know which horse the sponsor favors to win among the sponsor's "team" of jockeys. The regulation at issue, however, appears to have *nothing* to do with assessing foul play or avoiding collusion. The regulation itself does not mention a standard to determine whether a logo might obstruct a view of the jockey's racing uniform or whether corporate sponsorship of jockeys might lead to betting collusion. Here, the stated and apparent purpose relates entirely to jockey appearance in the interest of maintaining the "traditions of the turf." From a fair reading of the regulation, it appears completely unrelated to the purposes the Authority now espouses.

The Authority had the option of introducing testimony showing why this regulation was intended to promote the Authority's worthy goals. No one from the Authority testified that this regulation was intended to prevent corporate corruption. Perhaps the reason is that no one has imagined this was its purpose. Moreover, Mr. Leigh, the able racing steward who testified on behalf of the Authority, attempted to describe the relevance of these regulations to inquiry decisions. He could not describe a single incident in the last sixteen years where the regulation may have served that purpose. Furthermore, he had no idea whether the regulation was in fact intended or administered for that purpose. His testimony was completely unpersuasive as to the Authority's burden of proof.

The Authority raises the legitimate point that the Court should not second guess its regulatory authority. The Authority's interpretation of its own regulations is certainly entitled to substantial deference. The Authority is correct; this Court is not free to substitute its own judgment as to the proper interpretation of the agency's regulations. *See Aubrey v. Office of the Attorney General*, 994 S.W.2d 516 (Ky.App.1998). It is not the Court's intention to do so. In fact, no one disputes the meaning of the regulation. It prohibits all advertising and writings inconsistent with the "traditions of the turf" as determined by the Authority. What this Court must determine is whether this regulation directly furthers the Authority's stated objectives. This is a legal determination to which no deference is due. In any event, the Authority has provided no evidence to which the Court might accord any deference. Without any evidence from the Authority, the Court can only do so by examining the regulation and reaching its own conclusion. That the Court has done.

During the hearing, the Authority attempted to bolster its argument by citing Section 6(4) of 810 KAR 1:009, which prohibits "Contract Riders" from accepting "any present, money, or reward of any kind in connection with his riding of any race except through his contract employer." Although the Authority made this argument, it offered no testimony about the definition of "Contract Riders." Several riders, however, testified that the term applies only to one with an exclusive contract with an owner or trainer. This interpretation seems sensible. If this provision applied to all riders as the Authority suggests, then the regulation would prohibit a rider from entering into an endorsement contract that pays an incentive for being the winning jockey on a major stakes race. Without further testimony or evidence, it is difficult to conclude that the

Authority intended such a broad reach of this provision. In any event, based upon the testimony of the riders, the Court concludes that the "Contract Riders" provision does not apply to these Plaintiffs.

Because the Court concludes that the regulatory provision at issue has no direct or material nexus to the legitimate interests that the Authority asserts, its inquiry must end somewhat prematurely. Without such a nexus, the Authority cannot justify a limitation on Plaintiffs' First Amendment rights. The Court notes its duty to reach a decision on the evidence presented, not on one's general belief about the relative benefits and detriments of a particular challenged action. The Court must enjoin this regulation as applied to these Plaintiffs because the Authority failed to explain or even attempt to explain the nexus between the "traditions of the turf" qualification or the prohibition of "advertising, promotional, or cartoon symbols or wording" contained in the regulation. This failure of proof occurred despite this Court's repeated requests that the Authority provide an official explanation of its policy or bring forth a witness who could speak to its concerns, courses of actions, and intent. For whatever reason, the Authority rested its case upon the testimony of a lone witness, who had no knowledge of matters so vital to the resolution of this action. Plaintiffs have established "a strong likelihood of success on the merits" and therefore meet the determinative factor for issuing a preliminary injunction. The Court will enjoin 810 KAR 1:009, § 14(3) as applied to these Plaintiffs.

## VIII.

The determination of the appropriate equitable relief is within the sound discretion of the trial court. *Gutzwiller v. Fenik,* 860 F.2d 1317, 1333 (6th Cir.1988). Plaintiffs' request for equitable relief raises a host of considerations. Though the Court determined that abstention was unnecessary, the concerns which the Court addressed in its analysis are real indeed. There is no power the exercise of which is more delicate, which requires greater caution, deliberation, and sound discretion, or more dangerous in a doubtful case than the issuing of an injunction. *Detroit Newspaper Publishers Ass'n v. Detroit Typographical Union No. 18,* 471 F.2d 872, 876 (6th Cir.1972). This relief is preliminary, equitable and under extraordinary circumstances. The caution of previous Court decisions is well advised.

The Authority has the experience, ability and responsibility to regulate thoroughbred racing in Kentucky. The Court is concerned about the possibility that in the process of protecting constitutional rights, its ruling could have the effect in the short term of upsetting the heretofore relatively uneventful regulatory process. Moreover, the Court has heard only the intentions of those jockeys who have filed as Plaintiffs in these two cases. The Court has quite sure that their intentions comport with the "traditions of the turf," however that term may be presently defined. Injunctive relief is to be molded to the necessities of a particular case. *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 62, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975). Out of concern that the Authority retain its rightful regulatory control, the Court will, in the interest of equity and until it may consider more fully any final order, limit the scope of its equitable relief.

Because the Court has joined enforcement of the regulations applied to these Plaintiffs, the scope of relief is appropriately limited. The enforcement of the regulation to prohibit wearing a Jockeys' Guild patch, as introduced into evidence, is enjoined as to all licensed jockeys. Any jockey may wear the patch. As to the

commercial restriction, however, unfortunately the regulation is enjoined only as to all the Plaintiffs in these two cases. No others applied for the relief nor was testimony introduced regarding the needs or the intentions of those other jockeys. This is preliminary and equitable relief from the regulation as applied. In its discretion, the Court considers this relief fair and equitable.

The Court will schedule a hearing within the next thirty days to determine whether this relief should be expanded or made final. In the interim, the Authority will have an opportunity to consider the true purpose and future of this regulation.

The Court will enter an order consistent with this Memorandum Opinion.

## ORDER

Plaintiffs Robby Albarado, Brian Peck, and Shane Sellers and Plaintiffs Jerry Bailey, John Velazquez, José Santos, Alex Solis, and Shane Sellers have moved for a preliminary injunction against Defendants Kentucky Racing Commission and Kentucky Horse Racing Authority to enjoin them from enforcing 810 Ky. Admin. Regs. 1:009 § 14(3).

Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Plaintiffs' motions for a preliminary injunction are SUSTAINED in part and the Kentucky Racing Authority is enjoined from enforcing 810 KAR 1:009 § 14(3) as applied, subject to the conditions set forth herein.

IT IS FURTHER ORDERED that the enforcement of 810 KAR 1:009 § 14(3) as to the Jockeys' Guild patch is enjoined as to all jockeys and enforcement as to commercial advertisements and other promotional writing is enjoined as to those jockeys who are parties to these lawsuits.

The Court will schedule a hearing within the next thirty days to consider further relief.

## MEMORANDUM AND ORDER

On July 20, 2004, the Court convened a telephone conference of all the parties. Defendants advised the Court of their intention not to introduce further evidence at any subsequent hearing on a permanent injunction. Defendants' decision to stand on the current record made a further hearing unnecessary. Plaintiffs did request an opportunity for discovery and a trial on the merits. The Court concluded that neither was necessary because Plaintiffs had achieved all possible relief requested. The Court concluded that it could enter a permanent injunction on the same grounds as previously stated in its Memorandum Opinion and the Order, previously entered on April 29, 2004.

The Court will require no formal answer or pleading setting forth defenses by Defendant. The pleadings and arguments of Defendant at the hearing on the motion for preliminary injunction are construed as setting forth its defenses and affirmative defenses upon which the Court has ruled. The Court acknowledges that Defendant denies liability for costs and attorney's fees and this dispute is preserved for any later proceedings. Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that the Kentucky Racing Authority is hereby permanently enjoined from enforcing 810 KAR 1:009 § 14(3).

IT IS FURTHER ORDERED that Plaintiffs shall be granted an extension of

time to and including August 20, 2004, in which to file a motion and memorandum in support of their attorney's fees. Defendants shall have to and including September 16, 2004, in which to respond. Plaintiffs may file a reply on or before September 21, 2004.

This is not a final and appealable order.