GRUENDER, Circuit Judge.
The Governor and Attorney General of South Dakota (“the State”), along with the intervenor crisis pregnancy centers, appeal the district court’s preliminary injunction preventing the 2005 version of South Dakota’s statute regulating informed consent to abortion from becoming effective. For the reasons discussed below, we vacate the preliminary injunction and remand to the district court for further proceedings.
I.
In 2005, South Dakota enacted House Bill 1166 (“the Act”), amending the requirements for obtaining informed consent to an abortion as codified in S.D.C.L. § 34-23A-10.1. Section 7 of the Act requires the performing physician to provide certain information to the patient as part of obtaining informed consent prior to an abortion procedure and to certify that he or she believes the patient understands the information. The provisions of § 7 relevant to the preliminary injunction are as follows (emphases added):
No abortion may be performed unless the physician first obtains a voluntary and informed written consent of the pregnant woman upon whom the physician intends to perform the abortion, unless the physician determines that obtaining an informed consent is impossible due to a medical emergency and further determines that delaying in performing the procedure until an informed consent can be obtained from the pregnant woman or her next of kin in accordance with chapter 34-12C is impossible due to the medical emergency, which determinations shall then be documented in the medical records of the patient. A consent to an abortion is not voluntary and informed, unless, in addition to any other information that must be disclosed under the common law doctrine, the physician provides that pregnant woman with the following information:
(1) A statement in writing providing the following information:
(a) The name of the physician who will perform the abortion;
(b) That the abortion will terminate the life of a whole, separate, unique, living human being;
(c) That the pregnant woman has an existing relationship with that unborn human being and that the relationship enjoys protection under the United States Constitution and under the laws of South Dakota;
(d) That by having an abortion, her existing relationship and her existing constitutional rights with regards to that relationship will be terminated;
(e) A description of all known medical risks of the procedure and statistically significant risk factors to which the pregnant woman would be subjected, including:
(i) Depression and related psychological distress;
(ii) Increased risk of suicide ideation and suicide;
(2) A statement by telephone or in person, by the physician who is to perform the abortion, or by the referring physician, or by an agent of both, at least *727 twenty-four hours before the abortion, providing the following information:
(a) That medical assistance benefits may be available for prenatal care, childbirth, and neonatal care;
(b) That the father of the unborn child is legally responsible to provide financial support for her child following birth, and that this legal obligation of the father exists in all instances, even in instances in which the father has offered to pay for the abortion;
(c) The name, address, and telephone number of a pregnancy help center in reasonable proximity of the abortion facility where the abortion will be performed; ...
[¶ 2] Prior to the pregnant woman signing a consent to the abortion, she shall sign a written statement that indicates that the requirements of this section have been complied with. Prior to the performance of the abortion, the physician who is to perform the abortion shall receive a copy of the written disclosure documents required by this section, and shall certify in uniting that all of the information described in those subdivisions has been provided to the pregnant woman, that the physician is, to the best of his or her ability, satisfied that the pregnant woman has read the materials which are required to be disclosed, and that the physician believes she understands the information imparted.
In addition, § 8(4) of the Act amended S.D.C.L. § 34-23A-1 to define “Human being” for the purposes of the informed-consent-to-abortion statute as “an individual living member of the species of Homo sapiens, including the unborn human being during the entire embryonic and fetal ages from fertilization to full gestation.” A physician who violates the Act knowingly or in reckless disregard is guilty of a Class 2 misdemeanor. S.D.C.L. § 34-23A-10.2.
Planned Parenthood Minnesota, North Dakota and South Dakota and its medical director Carole E. Ball, M.D. (collectively “Planned Parenthood”) sued to prevent the Act from taking effect, claiming that the disclosure requirements in § 7(l)(b)-(d) and the physician certification requirement in § 7 ¶2 violate physicians’ free speech rights; that the disclosure requirements in §§ 7(l)(e)(i)-(ii) and (2)(c) are unconstitutionally vague in that they fail to give physicians adequate notice of the conduct proscribed; that being subjected to the disclosures in § 7(l)(b)-(d) unduly burdens patients’ rights to an abortion and violates their free speech rights; and that § 7 unduly burdens patients’ right to an abortion because its health exception is inadequate.
In June 2005, Planned Parenthood moved for a preliminary injunction to prevent the Act from taking effect as scheduled on July 1, 2005. In support of the argument that §§ 7(l)(b)-(d) would violate physicians’ free speech rights by compelling them to deliver the State’s ideological message, rather than truthful and non-misleading information relevant to informed consent to abortion, Planned Parenthood’s evidence consisted solely of affidavits from Dr. Ball and bioethicist Paul Root Wolpe, Ph.D. In her affidavit, Dr. Ball described her professional background, including a board certification in obstetrics and gynecology. Without elaboration, Dr. Ball stated that the disclosures in §§ 7(l)(b)-(d) “are statements of ideology and opinion, not medicine or fact.” Ball Aff. ¶ 2. Dr. Ball also stated that she would be unable to clarify the disclosures upon a patient’s request, as required by § 7, “because these are not medical statements or facts that I am trained as a Medical Doctor to address.” Id. ¶4. The affidavit *728 made no reference to the Act’s definition of “human being” in § 8(4).
Dr. Wolpe’s affidavit included a curriculum vitae detailing his expertise in “the area of ideology in medicine and bioethics.” Wolpe Aff. ¶ 1. Dr. Wolpe stated that the proposition “that from the moment of conception, an embryo or fetus is a ‘whole, separate, unique, living human being’ ... is not a scientific or medical fact, nor is there a scientific or medical consensus to that effect.” Id. ¶¶ 2, 3. Dr. Wolpe further averred that “to describe an embryo or fetus scientifically and factually, one would say that a living embryo or fetus in útero is a developing organism of the species Homo Sapiens which may become a self-sustaining member of the species if no organic or environmental incident interrupts its gestation.” Id. ¶ 6.
In its opposition to the motion for preliminary injunction, the State introduced portions of the Act’s legislative history[1] and several affidavits. The legislative history includes testimony from several women who had obtained abortions in South Dakota and felt their decisions would have been better informed if they had received from their abortion providers the information required by § 7. In addition, the legislative history includes testimony from experts such as Marie Peeters-Ney, M.D., a physician and geneticist, explaining the scientific basis for the disclosure required by § 7(l)(b) that “the abortion will terminate the life of a whole, separate, unique, living-human being.” Dr. Peeters-Ney testified that use of the term “human being” was accurate because:
Becoming a member of our species is conferred immediately upon conception. At the moment of conception a human being with 46 chromosomes comes into existence. These chromosomes, the organization, the chromosomal pattern is specifically human. The RNA, the messenger protein, the proteins are distinctly human proteins. So this new human being is a member of our species, and humanity is not acquired sometime along the path, it occurs right at conception.
Senate State Affairs Comm. Hearing at 25. Dr. Peeters-Ney also stated that an embryo or fetus is whole in the sense that “[a]ll the genetic information sufficient and necessary to mature, and the information that is needed for this human being’s entire life is present at the time of conception”; that it is “separate from the mother” because “[t]he genetic program is totally complete and this human being will mature according to his or her own program”; and that it is unique because it has “a totally unique genetic code.” Id. at 25-26.
The State augmented the points raised in the legislative history with eight affidavits from medical experts and eight from women who had undergone abortions or worked at crisis pregnancy centers. For example, David Fu-Chi Mark, Ph.D., a molecular biologist employed in the pharmaceutical industry, stated that the Act’s definition of “human being” as an “ ‘individual living member of the species Homo sapiens,’ including human beings living in útero, makes it clear that the statement under [§ 7(l)(b) ] is stated as a scientific fact and nothing more. As such, it is truthful and scientifically accurate.” Mark Aff. ¶ 1. The affidavit described in detail the DNA and RNA science supporting the accuracy of the statement. Similarly, Bruce Carlson, M.D., Ph.D., a professor of *729 medicine and author of a widely used textbook on human embryology, stated that “[t]he post implantation human embryo is a distinct individual human being, a complete separate member of the species Homo sapiens, and is recognizable as such.” Carlson Aff. ¶¶ 1, 5.
The district court held a hearing on the motion for preliminary injunction. Planned Parenthood argued that patients receiving the disclosure in § 7(l)(b) would never receive the limited statutory definition of “human being.” Prelim. Inj. Mot. Hr’g (June 28, 2005) Tr. at 20; see id. at 25 (“If you want to talk about Homo sapiens, and go on and talk about there is a developing organism that is unique, that may be correct. That is not what the State’s message attempts to do here.”). Planned Parenthood contended that, as a result, patients would understand the plain meaning of “whole, separate, unique, living human being” to mean a “person” in the fullest moral and legal sense and that this compelled disclosure that a fetus or embryo is a “person” would violate Roe v. Wade[2] and its progeny. Id. at 20-21. Planned Parenthood likewise argued that §§ 7(l)(e) and (d) were infirm based on their reference to the fetus or embryo as a “human being.” Id. at 23. Planned Parenthood also asserted that the Act’s certification requirement would not allow the physician to disassociate himself or herself from the Act’s ideological message. Id. at 13.
The State responded that every patient would receive the definition that “human beings are defined as members of the species Homo sapiens” because “that’s right in the statute.” Id. at 46. With regard to disassociation, the State contended that “all [the physician] has to do is explain that basic scientific fact and then he can go on and have any kind of discussion about philosophy, theology or morality, or whatever it is that he wants to talk about.... [The physician’s] only obligation is regarding this narrow scientific fact.” Id. at 47.
The district court, applying our Dataphase[3] test, granted a preliminary injunction based on its finding that Planned Parenthood had a fair chance of success on its claim that § 7(l)(b) violated physicians’ free speech rights and that the balance of harms favored Planned Parenthood. See Planned Parenthood v. Rounds, 375 F.Supp.2d 881 (D.S.D.2005). The district court apparently accepted the argument that the Act’s limited definition of “human being” would not be included in any disclosure, or, if included, would have no effect on the patient’s understanding of the term, finding that the Act
requires abortion doctors to enunciate the State’s viewpoint on an unsettled medical, philosophical, theological, and scientific issue, that is, whether a fetus is a human being. See Roe v. Wade, 410 U.S. 113, 159, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (the word person as used in the Fourteenth Amendment does not include the unborn); [Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 913, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992)] (Stevens, J., concurring) (fetus is a developing organism that is not yet a person).
*730 Id. at 887. The district court also emphasized the absence of a provision in the Act expressly allowing physicians to disassociate themselves from the required disclosures. Id. Citing § 10 of the Act, which states that the prior version of S.D.C.L. § 34-23A-10.1 should remain in effect if “the provisions” of § 7 of the Act are preliminarily enjoined, the district court also preliminarily enjoined §§ 7(l)(c)-(e), (2) and ¶2 without any further analysis. Id. at 889. The two crisis pregnancy centers and their members intervened in the case in July 2005 and participated in the briefing and argument of this matter on appeal. After a divided panel of this court affirmed the grant of the preliminary injunction, we elected to grant rehearing en banc.
II.
We have jurisdiction under 28 U.S.C. § 1292(a)(1) to review an interlocutory order granting a preliminary injunction. In granting the preliminary injunction, the district court, applying our circuit precedent based on Dataphase, analyzed likelihood of success on the merits in terms of whether Planned Parenthood had a “fair chance of prevailing” on the merits, with a “fair chance” meaning something less than fifty percent. Planned Parenthood, 375 F.Supp.2d at 885. Using this standard, the district court preliminarily enjoined an entire state statute based on two short affidavits that, as we discuss in detail in the following section, simply presumed that a key statutory definition would be ignored. As explained below, however, under our Dataphase-based precedent, the “fair chance” standard should not be applied to motions to preliminarily enjoin the enforcement of a state statute. Instead, we now clarify that, where a preliminary injunction of a duly enacted state statute is sought, we require a more rigorous threshold showing that the movant is likely to prevail on the merits.
We begin with a brief history of the showing of likelihood of success on the merits required for the issuance of a preliminary injunction in our circuit. Prior to 1978, we required any party seeking a preliminary injunction to show a “substantial probability of success at trial.” Fennell v. Butler, 570 F.2d 263, 264 (8th Cir.1978). This requirement, in combination with a showing that irreparable injury would occur absent the injunction, was referred to as the “traditional test[].” Id.; see also Doran v. Salem Inn, Inc., 422 U.S. 922, 931, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975) (“The traditional standard for granting a preliminary injunction requires the plaintiff to show that in the absence of its issuance he will suffer irreparable injury and also that he is likely to prevail on the merits”). The Second Circuit rule at that time was that a preliminary injunction should issue “only upon a clear showing of either (1) probable success on the merits and possible irreparable injury, or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.” Gresham v. Chambers, 501 F.2d 687, 691 (2d Cir.1974) (quotation omitted). While the first prong of the Second Circuit’s test mirrored our circuit’s traditional test, the second prong had no analog in our circuit. In Fennell, after a district court found that no preliminary injunction should issue under our traditional test, a panel of this court remanded with instructions to consider whether a preliminary injunction should issue under the second prong of the Second Circuit test. Fennell, 570 F.2d at 264. After Fennell, district courts in our circuit began to analyze motions for preliminary injunctions under both the traditional test and the alternative second-prong test adopted *731 from the Second Circuit. See Dataphase, 640 F.2d at 114 n. 1 (Ross, J., concurring) (collecting cases demonstrating the “confusion in the district courts”).
Our court en banc endeavored to unify the two tests in Dataphase. As a result of the unification, the alternative test adopted from the Second Circuit effectively displaced the traditional test’s threshold requirement of showing a “substantial probability” of success at trial. Data-phase rejected the notion that the party seeking relief must show “a greater than fifty per cent likelihood that he will prevail on the merits,” holding instead that “where the balance of other factors tips decidedly toward plaintiff a preliminary injunction may issue if movant has raised questions so serious and difficult as to call for more deliberate investigation.” Dataphase, 640 F.2d at 113.
We note that the Second Circuit, the source of our Dataphase “fair chance” standard, applies only its more rigorous analog to our traditional test, rather than its less rigorous analog to the Dataphase “fair chance” test, where a preliminary injunction of the implementation of a statute is sought:
Where the moving party seeks to stay government action taken in the public interest pursuant to a statutory or regulatory scheme, the district court should not apply the less rigorous fair-ground-for-litigation standard and should not grant the injunction unless the moving party establishes, along with irreparable injury, a likelihood that he will succeed on the merits of his claim.
Able v. United States, 44 F.3d 128, 131 (2d Cir.1995) (per curiam) (quoting Plaza Health Labs., Inc. v. Perales, 878 F.2d 577, 580 (2d Cir.1989)); accord Heideman v. South Salt Lake City, 348 F.3d 1182, 1189 (10th Cir.2003) (“[T]he Second Circuit has held, and we agree, that where a preliminary injunction seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme, the less rigorous fair-ground-for-litigation standard should not be applied.”) (internal quotations and alterations omitted); but see Rodde v. Bonta, 357 F.3d 988, 994 n. 8 (9th Cir.2004) (declining to apply a more rigorous standard for likelihood of success on the merits on a motion to preliminarily enjoin “legislative action taken by a duly appointed public body”).
We expressly adopted the Second Circuit’s reasoning in Richenberg v. Perry, 73 F.3d 172 (8th Cir.1995) (per curiam), holding that “a substantial likelihood of success on the merits ... must be the standard when considering whether to grant a preliminary injunction preventing the implementation of a statute that was the product of lengthy public debate involving both Congress and the President.” Id. at 172-73 (citing Able); see also Jensen v. Dole, 677 F.2d 678, 679-80 (8th Cir.1982) (per curiam) (evaluating, in accord with Dataphase, a motion for preliminary injunction of the enforcement of a federal statute using the traditional test’s requirement for a “substantial probability” of success on the merits). Nevertheless, we more recently have characterized the Dataphase standard for likelihood of success on the merits as requiring a showing of a “substantial likelihood,” e.g. Kai v. Ross, 336 F.3d 650, 656 (8th Cir.2003), or a “fair chance,” e.g. Heartland Acad. Cmty. Church v. Waddle, 335 F.3d 684, 690 (8th Cir.2003), of success on the merits without explaining whether these two standards are substantively different or why one was chosen instead of the other for a particular case. We now reaffirm Richenberg’s adoption of the Second Circuit’s reasoning and clarify that a party seeking a preliminary injunction of the implementation of a state statute must demonstrate more than just a *732 “fair chance” that it will succeed on the merits. We characterize this more rigorous standard, drawn from the traditional test’s requirement for showing a likelihood of success on the merits, as requiring a showing that the movant “is likely to prevail on the merits.” Doran, 422 U.S. at 931, 95 S.Ct. 2561; see also Able, 44 F.3d at 131 (requiring the movant to show “a likelihood that he will succeed on the merits of his claim”) (emphasis added).[4] As the Able court explained, a more rigorous standard “reflects the idea that governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly.” Able, 44 F.3d at 131. If the party with the burden of proof makes a threshold showing that it is likely to prevail on the merits, the district court should then proceed to weigh the other Dataphase factors. See Dataphase, 640 F.2d at 113.[5]
In conclusion, we emphasize that district courts should still apply the familiar “fair chance of prevailing” test where a preliminary injunction is sought to enjoin something other than government action based on presumptively reasoned democratic processes. Only in a case such as this one, where a preliminary injunction is sought to enjoin the implementation of a duly enacted state statute,[6] must district *733 courts make a threshold finding that a party is likely to prevail on the merits. By re-emphasizing this more rigorous standard for demonstrating a likelihood of success on the merits in these cases, we hope to ensure that preliminary injunctions that thwart a state’s presumptively reasonable democratic processes are pronounced only after an appropriately deferential analysis.
III.
The district court granted the preliminary injunction based solely on Planned Parenthood’s claim that § 7(l)(b) violates physicians’ First Amendment rights to be free from being compelled to speak.[7] We review that decision for an abuse of discretion. Lankford v. Sherman, 451 F.3d 496, 503 (8th Cir.2006). “An abuse of discretion occurs where the district court rests its conclusion on clearly erroneous factual findings or erroneous legal conclusions.” Id. at 503-04. In the instant case, the district court rested its conclusion on an error of law when it ignored the statutory definition of “human being” in § 8(4) of the Act. Taking into account the statutory definition, we find that Planned Parenthood’s evidence at the preliminary injunction stage does not demonstrate that it is likely to prevail on the merits.
We first examine the contours of the right not to speak. “[T]he right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all.” Wooley v. Maynard, 430 U.S. 705, 714, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977). In general, to address a claim that a state action violates the right not to speak, a court first determines whether the action implicates First Amendment protections. Id. at 715, 97 S.Ct. 1428. If it does, the court must determine whether the action is narrowly tailored to serve a compelling state interest. Id. at 716, 97 S.Ct. 1428. “[Wjhere the State’s interest is to disseminate an ideology, no matter how acceptable to some, such interest cannot outweigh an individual’s First Amendment right to avoid becoming the courier for such message.” Id. at 717, 97 S.Ct. 1428.
In Planned Parenthood of Southeastern Pennsylvania v. Casey, the Supreme Court held that “a requirement that a doctor give a woman certain information as part of obtaining her consent to an abortion” implicates a physician’s First Amendment right not to speak, “but only as part of the practice of medicine, subject to reasonable licensing and regulation by the State.” 505 U.S. 833, 884, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (plurality opinion).[8] *734 However, the Court found no violation of the physician’s right not to speak, without need for further analysis of whether the requirements were narrowly tailored to serve a compelling state interest, id., where physicians merely were required to give “truthful, nonmisleading information” relevant to the patient’s decision to have an abortion, id. at 882, 112 S.Ct. 2791. Significantly, information deemed relevant in Casey was not limited to information about the medical risks of the procedure itself; the State also required the physician to inform the patient that the father of her child would be liable for child support and that other agencies and organizations offered alternatives to abortion. Id. at 881, 902-03, 112 S.Ct. 2791. Such information was relevant because it “furthers the legitimate purpose of reducing the risk that a woman may elect an abortion, only to discover later, with devastating psychological consequences, that her decision was not fully informed.” Id. at 882, 112 S.Ct. 2791. Furthermore, the fact that the information “might cause the woman to choose childbirth over abortion” did not render the provisions unconstitutional. Id. at 883, 112 S.Ct. 2791.
In the recent Gonzales v. Carhart decision, the Supreme Court reaffirmed in the context of abortion that “it is clear the State has a significant role to play in regulating the medical profession” and that “[t]he government may use its voice and its regulatory authority to show its profound respect for the life within the woman.” 550 U.S.-, 127 S.Ct. 1610, 1633, 167 L.Ed.2d 480 (2007). The Court described in detail the State’s interest in regulating the information provided by physicians prior to an abortion in the context of partial-birth abortion procedures:
Whether to have an abortion requires a difficult and painful moral decision. While we find no reliable data to measure the phenomenon, it seems unexceptionable to conclude some women come to regret their choice to abort the infant life they once created and sustained. Severe depression and loss of esteem can follow.
In a decision so fraught with emotional consequence some doctors may prefer not to disclose precise details of the means that will be used, confining themselves to the required statement of risks the procedure entails. From one standpoint this ought not to be surprising. Any number of patients facing imminent surgical procedures would prefer not to hear all details, lest the usual anxiety preceding invasive medical procedures become the more intense. This is likely the case with the abortion procedures here in issue.
It is, however, precisely this lack of information concerning the way in which the fetus will be killed that is of legitimate concern to the State. The State has an interest in ensuring so grave a choice is well informed. It is self-evident that a mother who comes to regret her choice to abort must struggle with grief more anguished and sorrow more profound when she learns, only after the event, what she once did not know: that she allowed a doctor to pierce the skull and vacuum the fast-developing brain of her unborn child, a child assuming the human form.
It is a reasonable inference that a necessary effect of the regulation and the knowledge it conveys will be to encourage some women to carry the infant to full term, thus reducing the absolute number of late-term abortions.
Id. at 1634 (citations omitted).
Casey and Gonzales establish that, while the State cannot compel an *735 individual simply to speak the State’s ideological message, it can use its regulatory authority to require a physician to provide truthful, non-misleading information relevant to a patient’s decision to have an abortion, even if that information might also encourage the patient to choose childbirth over abortion. Therefore, Planned Parenthood cannot succeed on the merits of its claim that § 7(l)(b) violates a physician’s right not to speak unless it can show that the disclosure is either untruthful, misleading or not relevant to the patient’s decision to have an abortion.
Taken in isolation, § 7(l)(b)’s language “[t]hat the abortion will terminate the life of a whole, separate, unique, living human being” certainly may be read to make a point in the debate about the ethics of abortion. Our role, however, is to examine the disclosure actually mandated, not one phrase in isolation. Planned Parenthood’s evidence and argument rely on the supposition that, in practice, the patient will not receive or understand the narrow, species-based definition of “human being” in § 8(4) of the Act, but we are not persuaded that this is so. See Wash. State Grange v. Wash. State Republican Party, 552 U.S. -, 128 S.Ct. 1184, 1190, 170 L.Ed.2d 151 (2008) (“[W]e must be careful not to go beyond the statute’s facial requirements and speculate about ‘hypothetical’ or ‘imaginary’ cases.”). South Dakota recognizes the well-settled canon of statutory interpretation that “[w]here [a term] is defined by statute, the statutory definition is controlling.” Bruggeman v. S.D. Chem. Dependency Counselor Certification Bd., 571 N.W.2d 851, 853 (S.D.1997). The Supreme Court emphasized the controlling nature of statutory definitions in analyzing a Nebraska partial-birth abortion statute:
When a statute includes an explicit definition, we must follow that definition, even if it varies from that term’s ordinary meaning. Meese v. Keene, 481 U.S. 465, 484-485, 107 S.Ct. 1862, 95 L.Ed.2d 415 (1987) (“It is axiomatic that the statutory definition of the term excludes unstated meanings of that term”); Colautti v. Franklin, 439 U.S. at 392-393, n. 10, 99 S.Ct. 675 (“As a rule, ‘a definition which declares what a term ‘means’ ... excludes any meaning that is not stated’ ”)....
Stenberg v. Carhart, 530 U.S. 914, 942, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000).
Section 7(1) essentially requires the physician to deliver a written form to the patient and lists some, but not all, of the information that must be included on that form. For example, § 7(l)(e) requires the disclosure form to contain a “description of all known medical risks of the procedure,” “including” certain subcategories; such language does not purport to establish the exact wording of the disclosure form. Nothing about the structure of § 7 supports the unusual proposition that the limiting statutory definition of a term used in the required disclosure should be ignored on the basis that it is stated in a separate “definitions” section. Given the well-recognized controlling nature of statutory definitions, it would be incumbent upon one preparing the disclosure form required by § 7(1), and upon a physician answering a patient’s questions about it, to account for any applicable statutory definitions.
Once one accepts that the required disclosure must take into account the limiting definition in § 8(4), the evidence submitted by the parties regarding the truthfulness and relevance of the disclosure in § 7(l)(b) generates little dispute. The disclosure actually mandated by § 7(l)(b), in concert with the definition in § 8(4), is “[t]hat the abortion will terminate the life of a whole, separate, unique, living human being,” § 7(l)(b), and that “human being” in this *736 case means “an individual living member of the species of Homo sapiens ... during [its] embryonic [or] fetal age[],” § 8(4). The State’s evidence suggests that the biological sense in which the embryo or fetus is whole, separate, unique and living should be clear in context to a physician, cf. Gonzales, 127 S.Ct. at 1627 (“[B]y common understanding and scientific terminology, a fetus is a living organism while within the womb, whether or not it is viable outside the womb.”), and Planned Parenthood submitted no evidence to oppose that conclusion. Indeed, Dr. Wolpe’s affidavit, submitted by Planned Parenthood, states that “to describe an embryo or fetus scientifically and factually, one would say that a living embryo or fetus in útero is a developing organism of the species Homo Sapiens which may become a self-sustaining member of the species if no organic or environmental incident interrupts its gestation.” Wolpe Aff. ¶ 6. This statement appears to support the State’s evidence on the biological underpinnings of § 7(l)(b) and the associated statutory definition. Planned Parenthood’s only other evidence, Dr. Ball’s affidavit, ignores the statutory definition of “human being.” Finally, this biological information about the fetus is at least as relevant to the patient’s decision to have an abortion as the gestational age of the fetus, which was deemed to be relevant in Casey. See 505 U.S. at 882, 112 S.Ct. 2791. As a result, Planned Parenthood cannot meet even the less rigorous requirement to show a fair chance of prevailing, much less the more rigorous requirement applicable here to show that it is likely to prevail, on the merits of its claim that the disclosure required by § 7(l)(b) is untruthful, misleading or not relevant to the decision to have an abortion. See Mazurek v. Armstrong, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) (per curiam) (emphasizing that a preliminary injunction “should not be granted unless the movant, by a clear showing, carries the burden of persuasion” and presents proof even more substantial than that required on a motion for summary judgment) (quotation omitted).[9]
Planned Parenthood also contends that ¶ 2 of the Act, requiring the physician to certify in writing that he or she “believes [the patient] understands the information imparted,” does not allow a physician to disassociate himself or herself from the required disclosure in § 7(l)(b). The ability to disassociate must be viewed in the context of the disclosure required. If a state-mandated disclosure is ideological in nature, the state could argue that, if the physician may completely disassociate himself or herself from the state’s ideological message, then the physician’s compelled speech rights are not implicated. Cf. Rust v. Sullivan, 500 U.S. 173, 200, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) (holding that regulations preventing physicians who par *737 ticipated in a federally funded program froip discussing abortion with their program-funded patients did not violate the physicians’ First Amendment rights because “[n]othing in [the regulations] requires a doctor to represent as his own any opinion that he does not in fact hold” and the effect of the regulations “cannot reasonably be thought to mislead a client into thinking that the doctor does not consider abortion an appropriate option for her”). On the other hand, neither Casey nor any other precedent of which we are aware suggests the proposition that, where a physician is required to disclose truthful and non-misleading information as part of obtaining informed consent to a procedure, the physician’s ability to disassociate from that truthful and non-misleading information is relevant to the compelled speech analysis. Because Planned Parenthood has failed to demonstrate the requisite likelihood of success on its claim that the disclosure required by § 7(l)(b) is untruthful or misleading, it has not demonstrated that there is an ideological message from which physicians need to disassociate themselves.[10] Therefore, we need not reach the disassociation issue in the instant case.
This argument is unavailing because Planned Parenthood introduced no evidence that the disclosure in § 7(l)(b), with the statutory definition of “human being” incorporated, would become false or misleading due to the particular circumstances of some patients. By contrast, the plaintiff in Schafer provided affidavits, albeit conclusory ones, to demonstrate the potential falsity of the information on medical-assistance and child-support benefits in particular circumstances. See 18 F.3d at 533-34. In the absence of some showing that there are particular circumstances in which a successful abortion will do something other than terminate the life of a whole, separate, unique, living member of the species of Homo sapiens during its embryonic or fetal age, Planned Parenthood cannot demonstrate that the physician’s ability to disassociate is implicated in this case.
Given Planned Parenthood’s failure to produce sufficient evidence to establish that it is likely to prevail on the merits of its compelled speech claim, we need not address the remaining Dataphase factors.[11] In summary, the district court *738 abused its discretion by failing to give effect to the statutory definition of “human being” in § 8(4) of the Act. Planned Parenthood’s evidence at the preliminary injunction stage does not establish a likelihood of proving • that, with the definition incorporated, the disclosure required by § 7(l)(b) is anything but truthful, non-misleading and relevant to the patient’s decision to have an abortion, and thus “part of the practice of medicine, subject to reasonable licensing and regulation by the State.” Casey, 505 U.S. at 884, 112 S.Ct. 2791. Accordingly, we vacate the preliminary injunction entered on compelled speech grounds by the district court.
IV.
Relying on § 10 of the Act, the district court’s order also preliminarily enjoined several other provisions of the Act without analysis and left the prior version of S.D.C.L. § 34-23A-10.1 in effect. The parties have disputed on appeal whether the language of § 10 required such a broad result. Because the preliminary injunction of the additional provisions followed solely from the preliminary injunction of § 7(l)(b) on compelled speech grounds, our vacatur of the preliminary injunction of § 7(l)(b) also vacates the associated preliminary injunction of the other provisions. As a result, resolution of the dispute concerning the effect of § 10 is not necessary to resolve the instant case. On remand, if the district court, in its discretion, finds that any of Planned Parenthood’s heretofore unaddressed claims merit a preliminary injunction of any section or subsection of the Act, the parties may, of course, make arguments to the district court about the effect that § 10 should have on the scope of any resulting preliminary injunction.
V.
We conclude that the district court erred in granting a preliminary injunction based on Planned Parenthood’s claim that the Act violates physicians’ First Amendment rights. Accordingly, we vacate the preliminary injunction and remand to the district court for further proceedings consistent with this opinion.

. See Hearing on House Bills 1166 and 1233 Before the House State Affairs Comm. (S.D. Feb. 9, 2005); Hearing Re: House Bills 1166, 1233, 1249 Before the Senate State Affairs Comm. (S.D. Feb. 23, 2005).

. 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

. Dataphase Systems, Inc. v. C L Systems, Inc., 640 F.2d 109, 113 (8th Cir.1981) (en banc) (holding that issuance of a preliminary injunction depends upon a "flexible” consideration of (1) the threat of irreparable harm to the moving party; (2) balancing this harm with any injury an injunction would inflict on other interested parties; (3) the probability that the moving party would succeed on the merits; and (4) the effect on the public interest).

. The Eighth Circuit’s pre-Dataphase phrasing of this element of the traditional test, a "substantial probability” of success on the merits, typically was satisfied by a showing of a greater than fifty percent probability of success. See, e.g., Modern Controls, Inc. v. Andreadakis, 578 F.2d 1264, 1269 (8th Cir.1978) (applying the traditional test and concluding "that Modern Controls would probably succeed on the merits because, on the basis of the evidence before the Court, the covenant not to compete was enforceable”) (emphasis added); Planned Parenthood of Minn., Inc. v. Citizens for Cmty. Action, 558 F.2d 861, 868 (8th Cir.1977) (applying the traditional test and concluding that "it appears probable that Planned Parenthood will prevail on its claim that the ordinance is invalid”) (emphasis added). There was some disagreement in Dataphase, however, on the traditional meaning of "substantial probability.” Compare 640 F.2d at 113 (“Some have read this element of the [traditional] test to require in every case that the party seeking preliminary relief prove a greater than fifty per cent likelihood that he will prevail on the merits.”) (emphasis added), with id. at 115 (Ross, J., concurring) (stating that the term "probability of success” must "mean a greater than fifty percent likelihood that the requesting party will prevail. If the courts which have used that phrase did not mean it to imply a better chance of prevailing than of not prevailing, they would have used the word ‘possibility’ or another word of a similar meaning. I cannot agree to this illogical exercise in semantics.”). To avoid the long and uncertain history associated with the terms "substantial probability” and “substantial likelihood” of success, we adopt the Supreme Court’s phrasing, "likely to prevail on the merits.” See Doran, 422 U.S. at 931, 95 S.Ct. 2561.

. Our focus on likelihood of success on the merits as a threshold issue should not be construed to lessen the importance of irreparable harm in the Dataphase analysis. "The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.” Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 506-07, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959). Indeed, in some cases, lack of irreparable injury is the factor that should begin and end the Data-phase analysis. See Adam-Mellang v. Apartment Search, Inc., 96 F.3d 297 (8th Cir.1996). In this respect, where a duly enacted statute is involved, a likelihood of success on the merits may be characterized as one, but not the only, threshold showing that must be met by a movant for a preliminary injunction.

. Although only a state statute is before us, our reasoning obviously indicates that the “likely to prevail on the merits” test, rather than the "fair chance” test, also should apply to the analysis of motions for preliminary injunctions of the enforcement of federal statutes. Where preliminary injunctions are sought to enjoin city ordinances or adminis *733 trative actions by federal, state or local government agencies, we note that the Second Circuit has examined the circumstances surrounding such government actions to determine to what extent the challenged action represents "the full play of the democratic process” and, thus, deserves the deference of the traditional test. See Able, 44 F.3d at 131—32.

. Planned Parenthood also advanced several other grounds in support of its motion for preliminary injunction. Because the district court's order addressed only the compelled speech challenge to § 7(l)(b), we limit our en banc review to that ground. See Jader v. Principal Mut. Life Ins. Co., 925 F.2d 1075, 1076 n. 1 (8th Cir.1991). On remand, the district court may, in its discretion, address the other arguments in support of the preliminary injunction in the first instance.

. We have adopted the standards enunciated by the Casey plurality opinion as controlling precedent in abortion cases. Planned Parenthood, Sioux Falls Clinic v. Miller, 63 F.3d 1452, 1456 n. 7 (8th Cir.1995) (recognizing the plurality opinion “as the Supreme Court's definitive statement of the constitutional law on abortion”); see also Stenberg v. Carhart, 530 U.S. 914, 930, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000) (applying, in a majority *734 opinion, the undue burden standard from the Casey plurality opinion).

. The dissent recognizes that the term "human being” "may refer to purely biological characteristics.” Post at 742. Section 8(4) of the Act does just that, defining "human being” as a "living member of the species Homo sapiens, including the unborn human being during the entire embryonic and fetal ages” for purposes of the required disclosure. Like the evidence submitted by Planned Parenthood, the dissent steadfastly ignores this biology-based definition and maintains that the required disclosure is ideological in nature and, therefore, unconstitutional. By ignoring the statutory definition of “human being," however, the dissent mischaracterizes the nature of the required disclosure and concludes that it compels a physician to answer the metaphysical question of when "human life” begins. Contrary to the dissent's analysis, the Act, when read in light of the nonmisleading statutory definition of "human being,” does not require a physician to address whether the embryo or fetus is a "whole, separate, unique” “human life” in the metaphysical sense.

. We also have indicated that disassociation becomes relevant if the disclosure mandated by the state is generally truthful and non-misleading, but is misleading as to a particular patient due to her specific circumstances. See Fargo Women's Health Org. v. Schafer, 18 F.3d 526, 533-34 (8th Cir.1994) (addressing, in the context of North Dakota’s informed-consent-to-abortion statute, the potential falsity of a disclosure of the availability of medical assistance benefits and paternal child support due to "unique and personal background facts” of the patient). In Schafer, we concluded that physicians would be able to comment on the misleading nature of the disclosures in those instances, and we found that an express statutory provision allowing physicians to disassociate from the disclosures supported our conclusion. Id. at 534. Planned Parenthood correctly points out that, unlike the statute in Schafer, the Act has no express provision allowing disassociation. Planned Parenthood further argues again that the certification requirement in § 7 ¶ 2, requiring the physician to certify in writing "that the physician believes [the patient] understands the information imparted,” effectively precludes the physician from disassociating.

. Our characterization of the requirement for the movant to show that it is likely to prevail on the merits as a “threshold” simply reflects that the court's consideration of the remaining Dataphase factors cannot tip the balance of harms in the movant’s favor when the requirement is not satisfied. We acknowledge that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.” Kirkeby v. Furness, 52 F.3d 772, 775 (8th Cir.1995) (quoting Elrod v. Burns, 427 U.S. *738 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opinion)). Nevertheless, without a showing that it will likely prevail on its claim that physicians will be compelled to deliver an ideological message, Planned Parenthood's asserted threat of irreparable harm is correspondingly weakened in comparison to the State’s (and the public's) interest in providing pregnant women with all possible relevant information about abortion, thereby "reducing the risk that a woman may elect an abortion, only to discover later, with devastating psychological consequences, that her decision was not fully informed." Casey, 505 U.S. at 882, 112 S.Ct. 2791. If the movant cannot show that it is likely to prevail on the merits, there is no reason at the preliminary injunction stage for the courts to disturb a duly elected legislature’s attempt to balance these interests.